[Civ. No. 3902. Third Appellate District.—October 19, 1929.]

FRANK H. GREVE, Appellant, v. TAFT REALTY COMPANY (a Corporation) et al., Respondents.

Miller & Ellis for Appellant.

Farrand & Slosson and L. J. Faust for Respondents.

PLUMMER, J.—The plaintiff began this action to recover of and from the defendants, and especially from the Taft Realty Company, the sum of $6,266.50, based upon an instrument in writing which is in the words and figures following, to wit:

"Hollywood, Calif. 6/6/23,

"It is understood and agreed that Frank H. Greve is to receive 2% of the gross sales made by us in the Greve Tract at the S. W. intersection of Pico Blvd. and Preuss Road, known as Tract No. 6800, in consideration of his getting this tract for us to handle.

"We also agree that he shall be paid 2% gross on sales from any other acceptable tract he secures for us to handle, or any other person bringing us an acceptable tract shall be paid the same amount.

> "Taft Realty Co.
> "By B. Y. Taft.
> "Mildred Taft Tinkham.
> "George W. Zent.
> "Chester A. Taft."

The defendant had judgment and the plaintiff appeals.

The complaint alleges that the writing just referred to was made and executed on the sixth day of June, 1923, whereby it was agreed to pay the plaintiff commissions as provided in said writing as a consideration to the plaintiff for procuring and delivering to the Taft Realty Company an agreement covering a tract known as the "Greve Tract," at the southwest intersection of Pico Boulevard and Preuss Road, desig-

nated as Tract No. 6800, by the terms of which it was agreed and provided that the Taft Realty Company should subdivide and sell said tract for an agreed compensation of fifteen per cent of the amount of all sales made in said tract; that under said agreement the Taft Realty Company had proceeded to sell lots in the tract referred to to the value of $328,765, upon which it had received commissions in the sum of fifteen per cent. It further alleged that the company had not paid to the plaintiff the amount specified in the contract, and judgment was asked to the amount of two per cent, as specified in the writing set forth herein. The record shows that on or about the fourteenth day of June, 1923, an agreement relating to the tract referred to was entered into between Marie E. Greve, Rudolph E. Greve, Mamie Greve, George C. Greve, Frank H. Greve and Margarita M. Greve, as parties of the first part, and Taft Realty Company, as party of the second part, by A. Z. Taft, Jr., first vice-president, and B. Y. Taft, second vice-president, whereby it was agreed that the party of the second part should proceed with the subdivision and sale of approximately thirty-four acres of the tract herein named, according to the terms and conditions set forth in the agreement, and to receive as compensation therefor fifteen per cent of the selling price in and to all lots sold. The record further shows that under the terms of the agreement just referred to the Taft Realty Company proceeded to sell all of the lots included in said tract for the sum of money herein stated. The court found, among other things, that the Taft Realty Company did not, on the sixth day of June, 1923, or at any other time, execute the two per cent agreement hereinbefore referred to. It further found that the Taft Realty Company did not receive or retain fifteen per cent of the gross sales of said property under or by virtue of any contract for the sale thereof procured by plaintiff in performance of the alleged agreement set forth in said complaint. It may be here stated in this connection that the court did not find that the plaintiff did not procure the agreement for the subdivision and sale of the lots referred to by the Taft Realty Company, but only that it was not in pursuance of the two per cent commission agreement. The court further found that "B. Y. Taft did not, in the capacity of acting executive officer or second vice-president of said corporation, Taft

Realty Company, sign his name to, or execute said contract, and said B. Y. Taft did not intend to obligate, and did not obligate said corporation to perform said alleged agreement, nor was he, by said corporation, authorized to execute the same." The same finding was made by the court as to the signing of the two per cent agreement by Mildred Taft Tinkham, George W. Zent and Chester A. Taft, save that Mildred Taft Tinkham was described as the secretary and treasurer, George W. Zent as the general manager, and Chester A. Taft as the junior vice-president. In other words, that none of the parties signed the two per cent agreement as officers of said corporation, and did not intend to obligate the defendant corporation to comply with the terms of the agreement. Based upon these findings the court concluded that the plaintiff was not entitled to judgment as prayed for.

The answer of the defendants does not deny the signatures to the two per cent agreement, or that the name of the Taft Realty Company was affixed to the two per cent agreement and the names of the persons signed thereto just as appears in the copy which we have hereinbefore set forth, but does deny that at the time of the execution of said alleged contract, that the persons whose names are signed thereto were authorized by the defendant Realty Company to execute said agreement in its behalf. It also denies that the parties who signed the name of the Taft Realty Company and their own names to the agreement intended to bind the Taft Realty Company thereby. The answer admits the official character in the corporation of the persons whose names are affixed to the two per cent agreement, and also that George W. Zent was the manager of said corporation. So far as the answers of the defendants are concerned there is nothing set forth to indicate that the parties signing the same did not know the contents thereof. There is testimony set forth in the record to the effect that the parties did not read the paper. The pleadings are absolutely silent as to the question of knowledge. Nor is there anything in the pleadings indicating any fraud, duress or mistake; nor is there anything in the testimony indicating fraud, duress or mistake. The testimony, as we have said, is simply to the effect, by the witnesses Taft, that the agreement was not read, and its contents unknown.

That George W. Zent was the general manager of the Taft Realty Company during all of the time involved in the transactions considered upon this appeal is an admitted fact. It appears that he became such manager some time during the year 1920. By resolution of the board of directors of the company, adopted on September 1, 1921, certain powers to sign papers were conferred upon the officers of the company. The resolution conferring the powers reads as follows, to wit: ''It was decided that all checks, deeds or notes or obligations of any kind incurring liability against the company should be signed by the president, the first vice-president or the second vice-president and the first vice-president or second vice-president and the secretary or the assistant secretary, and that official documents should be signed by both vice-presidents or by a vice-president and the secretary or assistant secretary.'' The record also shows that an executive committee, composed of A. Z. Taft, Jr., George W. Zent and B. Y. Taft, was empowered to transact the business of the corporation. This executive committee passed upon matters concerning the corporation, though the record fails to show in what manner this committee transacted its business or passed upon matters pertaining to the corporation, other than as appears by the signatures of members of the committee to the exhibits set out in the transcript. No question is raised as to the authority of the two members of the executive committee who signed the agreement with the six members of the Greve family by which the Taft Realty Company took upon itself the subdivision and sale of the thirty-four acres referred to in this opinion, but the minutes of the corporation are absolutely silent as to any resolution or the adoption of any motion authorizing the entering into the agreement for the subdivision and sale of said lands, or anything in relation thereto. The same is true as to the two per cent commission contract. The same is true as to agreements set forth in the transcript as ''Exhibits 3 and 4.'' In other words, it appears that four instruments of writing set forth in the transcript as ''Exhibits 1, 2, 3 and 4'' were signed by officers of the corporation with the name of the corporation attached, and all, with the exception of the two per cent agreement, related either to the expenditures of money on tracts to be divided, or to the subdividing and sale of tracts, and acted upon by

the corporation through its officers without any resolution of the board of directors of any kind, or any mention in the minutes of such transactions being considered by the board of directors. From which only one inference can be drawn, and that is that the executive committee or persons signing the agreements transacted the business of the corporation with the knowledge and consent of the corporation, and this inference is strengthened by the fact that for the Greve Tract alone, to say nothing of the others, the corporation received $328,765, and retained the agreed commission of fifteen per cent on the selling price thereof. Just how much money was spent on the other tracts and how much money was received the record does not disclose. It may be here stated that we find nothing in the record indicating that the corporation did not know of the agreements for the sub-division and sale, or the expenditure of money upon the tracts involved, nor is the contention made that the signature of the corporation to any of those agreements was attached by officers unauthorized so to do, or not possessing the authority to attach the name of the corporation. In other words, so far as the record discloses the board of directors took no action whatever in relation to the contracts mentioned in this proceeding relative to the subdivision and sale of lands; the whole matter appears to have been left to the executive committee, consisting of three members, as heretofore stated. The record also discloses that there were two corporations, one called the Taft Realty Company and the other the Taft Land & Development Company. The officers of both corporations were the same. The executive committee of one corporation was the executive committee of the other, and George W. Zent was the manager of both corporations. In this particular it may be stated that the record shows the signature of the corporation to the agreement called "Exhibit 1," being the agreement covering the subdivision and sale of the thirty-four acre tract known as the "Greve Tract," was affixed by A. Z. Taft, Jr., first vice-president, and B. Y. Taft, second vice-president; that the signature of the Taft Land & Development Company to the agreement known as "Exhibit 3," providing for the improvement of the thirty-four acre tract, was affixed by George W. Zent, and to the agreement known as "Exhibit 4," covering a tract of 31.52 acres owned by one Ella H.

Somers, the signature of the Taft Realty Company was affixed by George W. Zent. In the agreements known as "Exhibits 3 and 4," the official character of George W. Zent is not set forth. In the two per cent commission agreement known as "Plaintiff's Exhibit 2," the signature of the Taft Realty Company appears to have been affixed by B. Y. Taft, Mildred Taft Tinkham, George W. Zent and Chester A. Taft, without any designation as to their official characters. The record, however, shows B. Y. Taft to be second vice-president, Mildred Taft Tinkham, secretary and treasurer, Chester A. Taft, Jr., vice-president, and George W. Zent, manager. B. Y. Taft and George W. Zent were also two of the three members of the executive committee.

In consideration of the foregoing premises is the testimony of B. Y. Taft and Chester A. Taft that the commission agreement was signed by them without having read its contents, and that they did not intend to bind the corporation to the agreement, sufficient to support the finding of the court that the corporation is not bound by the terms and conditions of the two per cent commission agreement. The contention is also made that the affixing of the name of the corporation to the commission agreement by the officers without setting forth their official designation is insufficient to constitute the agreement an obligation of the corporation.

The insufficiency of the testimony to support the findings of the court, as alleged by the appellant, can be determined by a consideration of the following propositions and authorities:

1. Was the commission agreement signed in such a manner as to bind the corporation, that is, was it or is it necessary that the official character of the officers affixing the signature of the corporation be set forth in connection with their names? In the case of *Amour* v. *Rosenberg & Sons,* 36 Cal. App. 773 [173 Pac. 404], we find a case directly in point, showing that the setting forth of the official character of the officers signing the corporation's name is unnecessary. There the instrument and signature were as follows: "We herein guarantee payment of 40 barrels of salad oil to be delivered to the American Packing Company. Very truly yours, Rosenberg & Sons Co., by J. R." The person signing the name of the corporation was shown by parol testimony to be the manager. In the case of *Baden Brick Co.*

v. *Chubbuck*, 7 Cal. App. 725 [95 Pac. 905], the signature held to bind the company was in the following words: "The Baden Brick Company, per Thomas Butler." In the case of *Rauer* v. *Nelson & Sons*, 53 Cal. App. 695 [200 Pac. 809], an instrument was held to be the agreement of the corporation although it did not appear upon its face to be signed by its president in his official capacity. These cases sufficiently establish the law that when the name of a corporation is attached to an agreement by its proper officers, it is unnecessary to attach to the names of the persons executing the agreement for the corporation the official designation of the one who signs his name, but that such official designation may be otherwise established. The two per cent agreement contains the names of two of the three members of the executive committee of the corporation, which, as we have shown, conducted the business of the corporation.

2. George W. Zent, as the general manager of the corporation, had authority as such to sign the two per cent agreement and bind the corporation by affixing its signature thereto. Before citing any authorities it may be stated that the record shows other agreements involving much money, signed simply by the general manager, notably Exhibits 3 and 4. In 6 Cal. Jur., page 1109, section 481, the powers of a manager are thus stated: "In the case of a corporation organized for commercial purposes, its general manager, or whoever may be given immediate direction or control of its affairs, is its agent, empowered, unless expressly restricted to the performance of certain specified acts, to do, in respect to the management of the ordinary and usual affairs of the corporation, what the corporation itself could do within the scope of its authority. . . . Therefore, a general manager may perform such acts as the following: making contracts for the corporation in the ordinary conduct of its affairs, including contracts of hire, or of employment, or of agency for the sale of land, or of lease of premises for the use of the corporation; the execution of notes, and the endorsement and transfer of commercial paper belonging to the corporation," etc. In the case of *Hoffman* v. *Guy M. Rush Co.*, 27 Cal. App. 167 [149 Pac. 177], in relation to the power of the manager, who, in that case was also president, we find the following in the opinion: "It is the conceded law that in order to bind a corporation by his

acts, it is not necessary that any resolution should be passed appointing a general manager. It will be sufficient if it be shown that he was manager *de facto.*" In the case at bar it is admitted that George W. Zent was appointed general manager. That case then goes on to hold as follows: "While the president of a corporation, if he is only that and nothing more, has no authority to bind the corporation by contract employing another to perform services for it, yet if he is also a general manager of the corporation, he is acting within his scope and authority in employing an agent for the purpose of making sales, and also to sign an agreement for the corporation providing for the payment of the services so performed." ▇ Other authorities might be cited but these are sufficient to show the authority of a general manager to bind the corporation by agreements such as we are considering in this case.

▇ The third proposition which we have to consider is whether the testimony of two of the officers, that they did not read the agreement and did not intend to bind the corporation, can be given any legal effect. The authorities all seem to be in the negative, a few of which we will cite: In *Silva* v. *Silva,* 32 Cal. App. 115 [162 Pac. 142], the law in such cases is thus stated: "A separation agreement, in the absence of a claim that the signature of either party was obtained by fraud, duress or undue influence, and no rescission being sought for mutual mistake, is binding, although one of the parties claims that she did not intend to sign a contract of separation, and did not understand its terms when she executed it, and that therefore there was no meeting of minds." In *Knox* v. *Modern Garage etc. Shop,* 68 Cal. App. 583 [229 Pac. 880, 881], it is said in the opinion, where the action was upon a contract: "In such an action a party cannot be heard to say that he has not read the same and did not know the contents thereof. Where a party to a written contract wishes to avoid liability thereon on the ground that he did not know its contents, the question, in the absence of misrepresentation, fraud, undue influence and the like terms, turns on whether he was guilty of negligence in signing without such knowledge. When he is negligent in informing himself of the contents and signs or accepts the agreement with full opportunity of knowing the true facts, he cannot avoid liability on the

ground that he was mistaken concerning such terms, in the absence of fraud or misrepresentation." In *Floyd* v. *Tierra Grande Dev. Co.*, 51 Cal. App. 654 [197 Pac. 684, 687], where the same question was presented in a slightly different form, the court held, quoting from the syllabus: "The force of a resolution passed by the directors of a corporation ratifying a contract for the exchange of real properties, cannot be avoided on the ground that all the parties present were ignorant of the contents of an agreement which they assembled to ratify. A corporation is bound by the same rules of law that govern individuals, and no concealed resolution, however artfully worded, may give a corporation an advantage which does not belong to an individual." In *Hawkins* v. *Hawkins*, 50 Cal. 558, the law in relation to signing agreements without reading them is thus stated: "If a person enters into a contract with another, between whom and himself no relation of a special trust or confidence exists, and it is reduced to writing by such other person, and the means of knowledge of the terms of the writing are equally open to both, and he signs it without reading or having it read by someone for him, he cannot avoid a liability created by the writing," etc. To the same effect is the recent case of *Gridley* v. *Tilson*, 202 Cal. 748 [262 Pac. 322], where it is said: "A party signing a contract to purchase corporation stock cannot excuse himself and escape its effects by testifying that he did not have his glasses with him at the time he signed the contract and gave promissory notes for the purchase price, and therefore did not read the contract or a provision thereof limiting the representations of the seller to those contained in the contract, in the absence of a showing that he was prevented by the agent from reading the limiting clause or was otherwise tricked into signing the document without reading it, and he made no request to have the contract read to him." To the same effect is the case of *Placer County Bank* v. *Freeman*, 126 Cal. 90 [58 Pac. 388], where it is said that in the absence of any allegation of fraud or undue influence, a party cannot rely upon his own negligence in failing to read the instrument signed by him. These cases and others which might be cited clearly establish the law that the testimony of the witnesses Taft that they did not read the commission agreement is wholly in-

sufficient to support the finding of the court that the corporation was not bound by the agreement. As we have shown, the signature of the general manager would be sufficient, without the signature of any other officers of the corporation.

In view of what we have stated, we do not need to discuss the claim of the appellant that commissions were paid for bringing in other tracts and charged as overhead expenses, nor do we need to give any consideration to the minutes of the corporation, relied upon by the respondents, relative to the proposed payment to the plaintiff of the sum of $4,500 as commissions in the event he brought in a certain other tract of land for subdivision and sale, as being the only one ever considered by the corporation. Whether these minutes had any proper place in the proceedings need not be determined. They do show, however, that the corporation was willing to pay commissions for the bringing in of tracts of land to be subdivided and sold.

The case of Howard v. Winton Co., 199 Cal. 374 [47 A. L. R. 1012, 249 Pac. 511], is inapplicable here. The questions there considered are readily distinguishable from anything involved in this action. There the agreement purported to give the employee or agent an interest in the net profits of the concern, as his compensation. No net profits are involved in this action. The record shows that the tract which was subdivided and sold, and for which the plaintiff claims commissions in the sum of two per cent, was brought in for subdivision and sale by the plaintiff and placed in the hands and under the control of the Taft Realty Company for subdivision and sale. Whether the two agreements constituted one transaction or are two separate and distinct instruments, appears to us to be wholly immaterial. We think that both agreements are the agreements of the Taft Realty Company, and that what we have said clearly establishes that the findings of the court are not sustained by the testimony.

The judgment is reversed.

Thompson (R. L.), J., and Finch, P. J., concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on November 18, 1929, and a

petition by respondents to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on December 16, 1929.

All the Justices concurred.