[Civ. No. 13777. First Dist., Div. One. Sept. 13, 1948.]

LOUIS CARLESIMO, Appellant, v. DAVE SCHWEBEL, Respondent.

Rogers & Clark and Bruce F. Allen for Appellant.

Leo H. Shapiro and Virgil G. Skinner for Respondent.

PETERS, P. J.—Plaintiff, Louis Carlesimo, brought this action against The Feldheym Company, Incorporated, a corporation, Dave Schwebel, an individual, Jesse Feldheym, an individual, and The Schwebel Company, a copartnership, for damages for the breach of a contract to sell to plaintiff two carloads of tomato paste. The damages were alleged to consist of a $3,125 deposit made by plaintiff, and $14,125 loss of profits. The corporation, the partnership and Feldheym were properly served, failed to appear, and default judgments were taken against them. Executions issued on these judgments and were returned satisfied to the extent of $16.40. Defendant Schwebel answered, and the cause proceeded to trial before the court without a jury against Schwebel alone. The trial court determined that Schwebel, as an individual, was not liable, and plaintiff appeals.

The facts are not substantially in dispute. Appellant and respondent were the only witnesses. Appellant operates a

wholesale wine and grocery business in New Jersey. He first met Schwebel in 1945 when the latter was a sales representative for the Pastori Winery. In July of 1946, Schwebel and Feldheym organized The Feldheym Company, Incorporated, for the purpose of buying and selling groceries. An office was opened at 149 California Street, San Francisco. On October 4, 1946, a letter was sent to appellant, who was then in Stockton, California. This letter was written on the stationery of The Feldheym Company, Incorporated. The corporate name is printed on the letterhead in large black letters at least a quarter of an inch high, and in heavy black type. The letter was signed:

"The Feldheym Co., Inc.<br>
*DAVE SCHWEBEL*<br>
Dave Schwebel"

The italicized name was in the handwriting of Schwebel, while the last line of the signature was typed. In this letter Schwebel informed appellant that he was no longer connected with Pastori, and stated: "*I* can get you the canned vegetables you are looking for particularly tomato products." The letter requested appellant to visit the writer "and *we* will go over your requirements. Please take notice of *our* new address." (Italics added.)

On October 26, 1946, appellant visited the office on California Street. On the office door were the names of Pastori Winery, Feldheym Company, Incorporated, and River Glow, Incorporated. Schwebel's name was not on the door.

Appellant testified that Schwebel introduced him to Jesse Feldheym, and stated that he and Feldheym were in business together, but did not disclose the nature of the relationship. After some discussion with Schwebel the contract forming the basis of this action was drafted by Schwebel. It is typed on the letterhead of The Feldheym Company, Incorporated, and is addressed to the Roma Distributing Company, operated by appellant. It confirms the purchase by appellant of 2,500 cases of tomato paste (two carloads) at $7.85 per case, F.O.B. cannery. Acknowledgment of $3,125 as a deposit is made, and the method of delivery stated. The contract was signed in the same fashion as the letter of October 4, 1946, mentioned above. It is admitted that Schwebel received the $3,125 deposit, that the tomato paste was not delivered, and that the deposit was never returned. The only evidence of damage, other than the amount of the deposit, was given by appellant to

the effect that on the date the tomato paste should have been delivered the broker's price per case was $13.50. Appellant testified that he did not learn that The Feldheym Company, Incorporated, was a corporation until he instituted the present action on April 11, 1947.

The evidence shows that during the fall of 1946 appellant placed some eight or nine other orders through Schwebel, and made deposits totaling $16,000 thereon. There were no deliveries under these orders, but all of these deposits were returned by Schwebel to appellant. All of these orders were on the stationery of The Feldheym Company, Incorporated, and appellant noticed that fact.

Defendant testified that The Feldheym Company, Incorporated, was organized in July of 1946, and went out of business in December, 1946. What caused the company to go out of business does not appear. Schwebel and Feldheym organized the company, and, pursuant to the approval of the state corporation department, five shares of stock were issued to each of them, for which each paid into the company $500. Schwebel was the secretary-treasurer, and Feldheym the president. A nephew of Schwebel's, who owned no stock, was vice-president. No other stock was issued, offered or subscribed. The sole capital of the corporation was this $1,000, plus $221.82 in cash paid in by Schwebel. From this total capital of $1,221.82, $373 was spent for costs of incorporation. Schwebel loaned the corporation some office furniture, and it rented a typewriter. The office was rented in the name of the corporation. The funds of the corporation were deposited in a bank in the corporate name, but Schwebel admitted that at times he kept some of the corporate funds in his personal safe deposit box.

On these facts the trial court found that The Feldheym Company, Incorporated, was a corporation; that it was untrue that Schwebel and Feldheym were partners; that it was untrue that the two incorporators used The Feldheym Company, Incorporated, as a fictitious name under which they did business, or created or used the corporation as a device to avoid their individual or partnership obligations; that the contract of October 26, 1946, was entered into with the corporation; that Schwebel was not a party to the contract, but signed only as agent for the corporation; that it was untrue that Schwebel used the corporation as an instrument through which he conducted his business so as to avoid his individual or partnership obligations to plaintiff.

The first contention made by appellant is that, as a matter of law, from the manner in which Schwebel signed the contract, he undertook a personal liability thereunder. Appellant attempts to bolster this argument by a reference to his testimony, apparently not believed by the trial court, that he did not know that The Feldheym Company, Incorporated, was a corporation until suit was filed.

There can be no doubt at all that, where directors or officers of a corporation contract with a third person who is ignorant of the existence of the corporation and to whom no disclosure of the existence of the corporation is made, such director or officer is personally liable on such contract. (See many cases collected 19 C.J.S. § 840, p. 264.) However, the mere self-serving statement of the third party that he did not know of the existence of the corporation is not binding on the trier of the facts. The true rule is that, in such cases, the directors or officers are personally liable unless the third person knew, or in the exercise of reasonable care should have known, that he was dealing with a corporation. Here the name of the company, including the abbreviation "Inc.," appeared on the door of the office. Any reasonable man, and certainly any reasonable businessman, should know that the abbreviation "Inc.," means "incorporated," which directly informs everyone dealing with the company that it is a corporation. The very sheet of paper upon which the contract is typed, and all correspondence between the parties, were on letterheads of the corporation with the words "The Feldheym Co., Inc.," printed thereon in heavy black type. Then, the signature of the contracting party reads:

"The Feldheym Co., Inc.

*DAVE SCHWEBEL*
Dave Schwebel"

Thus the contract discloses, on its face, that the corporation was a contracting party. Certainly the trial court from such evidence could infer, reasonably, that appellant had knowledge of the existence of the corporation prior to and at the time the contract was executed.

The real question on this phase of the case is not whether appellant knew that the corporation was a party, but whether, before an agent will be released from liability on a contract executed on behalf of a corporation, the contract must not only disclose the name of the principal but must also, on its face, disclose the fact that the agent is signing in a representative

capacity. ██ In the present case, had Schwebel appended the preposition "by" immediately before his signature, there would be no doubt at all that the contract would have disclosed, on its face, not only that appellant was dealing with the corporation, but that Schwebel was signing as an agent and not as a principal. Where that appears on the face of the contract the corporation is liable and the agent is not. (*Armour & Co.* v. *Rosenberg & Sons Co.*, 36 Cal.App. 773 [173 P. 404] ; *Greve* v. *Taft Realty Co.*, 101 Cal.App. 343 [281 P. 641].) ██ But, says appellant, the word "by" does not appear in this signature, and therefore Schwebel must be conclusively presumed to have signed in his individual capacity, even though the evidence is susceptible of the interpretation that Schwebel signed as an agent. To support this somewhat startling conclusion appellant mainly relies upon the case of *Otis Elevator Co.* v. *Berry*, 28 Cal.App.2d 430 [82 P.2d 704]. That case stands for no such rule. In that case the contract was for the repair of an elevator located in a hotel operated by the "Berry Hotels System," a corporation. Plaintiff addressed an offer to the "Hotel Berry Systems." Defendant accepted the offer as follows : "Signed and accepted in duplicate, Sept. 17, 1926. B. S. Berry." B. S. Berry was secretary of the company and was authorized to enter into contracts on its behalf. Over objection, the trial court admitted oral evidence that Berry signed the contract as agent of the corporation, and that plaintiff knew that this was the fact. The appellate court held that the finding to this effect was supported by evidence, but that the evidence had been erroneously admitted. Berry argued that an ambiguity was created because the offer was addressed to the "Hotel Berry Systems," and then signed "B. S. Berry." The court held that there was no ambiguity, and that extrinsic evidence should not have been admitted. In this connection the court stated (pp. 432-433.) : "The rule is that where a person signs his own name to a written contract, without qualification and without disclosing that he acts solely as agent, extrinsic evidence is inadmissible to prove that he acted solely as agent and was not a party to the contract. . . . An agent, who has signed his own name unqualifiedly, may introduce extrinsic evidence to show that he is not a party to the contract, only where the contract itself contains some phrase or provision which shows that he was acting in a representative capacity. (A.L.I., Restatement of the Law, Agency, sec. 323, subds. 2 and 3, and cases cited in the California Annotations thereto.) Applying this rule to the instant case, it is apparent

that no such ambiguity existed. The mere fact that the proposal was addressed to the defendant's principal is not enough, for the contract might also have been intended to bind the agent as well. Aside from the address, there is no reference in the contract to defendant's principal, and there is no clause in the contract which, either expressly or by implication, indicates that defendant acted in a representative capacity. Defendant signed his name without indicating the identity of his principal, or even the fact that he was acting as agent. Under these circumstances, he cannot now assert that he is not a party to the contract."

Appellant also cites *Patterson* v. *John P. Mills etc., Inc.,* 203 Cal. 419 [264 P. 759], which was also a case where the defendant signed a contract in his own name, and nowhere on the contract did the name of his principal appear. The court stated (p. 421) : "The contract does not disclose the name of the principal, and under such circumstances the plaintiff was entitled to hold the defendant."

The rule of these cases, and others that might be cited to the same effect, is not here applicable. In the Patterson case there was no indication at all that the contract was with another person. In the Berry case the acceptance signed by the defendant was not ambiguous. There was no indication at all that Berry was signing other than as an individual. The parol evidence rule, under such circumstances, prohibits the introduction of oral evidence to vary the terms of the written instrument. (*Broy* v. *Calaveras Central Gold Min. Co.,* 18 Cal. App.2d 371 [64 P.2d 456].)

In the instant case the contract was drafted on a letterhead on which the name of the corporation was emblazoned. The signature disclosed that The Feldheym Company, Incorporated, was a party to the contract. Immediately below the corporate name appears the written signature of Schwebel. To any person reading the document it would appear that Schwebel was signing for the corporation. To say the least, the signature is ambiguous, and parol evidence was admissible to explain it.

The Restatement of Agency is in accord with these views. Section 155 reads as follows: "In the absence of manifestations to the contrary therein, an unsealed written instrument is interpreted as the instrument of the principal and not of the agent if, from a consideration of it as a whole, it appears that the agent is acting as agent for a principal whose name appears therein as such."

In the comments following this section are several statements directly applicable in the instant case. They are as follows:

"a. If the integration of a contract is contained in a single document, the entire document, including the heading, body, and signature, is considered, . . . No part of a document is necessarily more important than any other part for the purpose of determining the parties thereto. . .

"c . . . Thus, the printed heading of stationery carrying the principal's name may be sufficient to indicate that a letter signed only in the agent's name is intended to be only the principal's letter."

Section 156 reads as follows: "In the absence of a manifestation to the contrary therein, an unsealed written instrument is interpreted as the instrument of the principal and not of the agent if, in the signature of description of the parties, the name of the principal and agent both appear, the agent indicating his agency."

In a comment to this section it is stated: "If the name of the principal is followed by the name of the agent without more, the arrangement of the names or the way in which the promise is made may indicate that the agent is not a party. If this does not appear, the inference is that the agent is a party; *extrinsic evidence that the agent was acting only for the principal is, however, admissible under the rule stated in § 323(2).*" (Italics added.)

Section 323(2) reads as follows: "If the fact of agency appears in an integrated contract, not sealed nor negotiable, and there is no unambiguous expression of an intention either to make the agent a party thereto or not to make him a party thereto, extrinsic evidence may be introduced to show the intention of the parties."

The rule of these sections is clearly applicable in the instant case. We therefore hold that, so far as the form of the signature is concerned, the finding that Schwebel signed as agent of the corporation, is amply supported by admissible evidence.

The next contention of appellant is that under the facts the trial court, as a matter of law, should have found that the corporate entity was but the *alter ego* of Schwebel, and was being used for an improper purpose. In other words, as a matter of law, appellant wants this court to disregard the corporate entity, and so remove the protection usually granted to stockholders in a corporation. Appellant makes several arguments on this issue, but they can be boiled down to two

in number. He first contends that he was "deceived" into believing that he was dealing with Schwebel as an individual, and did not know that he was dealing with a corporation. In this connection he refers to his own testimony to this effect. But the trial court has found otherwise and such finding, as already pointed out, is amply supported.

The second contention of appellant on this issue is that this corporation was underfinanced to such an extent that it constituted a fraud on persons dealing with it, and for that reason, and for that reason alone, as a matter of law, the corporate entity should be disregarded. The evidence on this issue is most unsatisfactory. The state corporation department authorized the company to sell to Schwebel and Feldheym an aggregate of 10 shares of stock at par ($100 per share) for cash. These 10 shares were purchased, five shares by each party, and the $1,000 so secured paid to the company. This sum, plus $221.82 advanced by Schwebel, constituted the sole capital of the company. No representation as to the extent of the capital of the company was made by Schwebel. The status of the capital of the company was a matter of public record. No evidence was introduced by either side (and the burden was on the plaintiff) as to what would constitute a reasonable capital for such a company. Practically no evidence was introduced as to the nature or amount of business transacted. All we know is that the corporation was engaged in buying and selling groceries, and that during the fall of 1946 this appellant entered into nine or ten deals with the company on which he deposited over $19,000, and that all such deposits, except the $3,125 involved in the present transaction, were returned by the company to appellant. What other transactions were entered into by this company, what and how much were involved, what amount of capital was reasonably necessary to carry out the deals, etc., was not developed. What caused the company to default on this contract, or what caused it to go out of business does not appear. There is not one word of evidence that any portion of the $3,125 deposit ever came to Schwebel personally, or that he profited therefrom. The trial court has found that the corporation was not used by Schwebel as a device to avoid his individual liabilities. Under such circumstances, and keeping in mind that the burden of proof on this issue was on plaintiff, we do not think that this court is required to hold, or should hold, that, as a matter of law, the corporate entity should be disregarded.

The law as to when the courts will pierce the corporate veil is easy to state, but hard to apply. One of the most recent cases to restate the law on the subject is *Stark* v. *Coker*, 20 Cal. 2d 839 [129 P.2d 390]. In that case the Supreme Court *affirmed* a judgment of the trial court disregarding the corporate entity, holding that the evidence was sufficient *to support* the action of the trial court. The court stated the applicable general rules as follows (p. 846):

"The conditions under which the corporate entity may be disregarded, or the corporation be regarded as the *alter ego* of the stockholders, necessarily vary according to the circumstances in each case inasmuch as the doctrine is essentially an equitable one and for that reason is particularly within the province of the trial court. Only general rules may be laid down for guidance. The basic rule was recently stated by this court in *Watson* v. *Commonwealth Ins. Co.*, 8 Cal.2d 61, 68 [63 P.2d 295]:

" 'The two requirements are that there be such unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist and that adherence to the fiction of separate existence would, under the circumstances, promote fraud or injustice. On the second score it is sufficient that it appear that recognition of the acts as those of a corporation only will produce inequitable results.' "

In *Cleaning & P. Co.* v. *Hollywood L. Service*, 217 Cal. 124 [17 P.2d 709], another leading case on the subject, the rules are summarized as follows (p. 129): "Whatever may be the rule in other jurisdictions, the rule is well settled in this state that the mere fact one or two individuals or corporations own all of the stock of another corporation is not of itself sufficient to cause the courts to disregard the corporate entity of the last corporation and to treat it as the *alter ego* of the individual or corporation that owns its stock. In addition it must be shown that there is such a unity of interest and ownership that the individuality of such corporation and the owner or owners of its stock has ceased; and it must further appear that the observance of the fiction of separate existence would, under the circumstances, sanction a fraud or promote injustice. Bad faith in one form or another must be shown before the court may disregard the fiction of separate corporate existence." (See, also, *Erkenbrecher* v. *Grant*, 187 Cal. 7 [200 P. 641], and *Norins Realty Co.* v. *Consolidated A. & T. G.*

*Co.*, 80 Cal.App.2d 879 [182 P.2d 593], for other good statements of the general rule.)

In most of the cases where this problem has been discussed, including *Stark* v. *Coker* (see quote *supra*), it has been held that the problem is primarily one for the trier of the facts, and is not a question of law. Thus in *H. A. S. Loan Service, Inc.* v. *McColgan*, 21 Cal.2d 518, 524 [133 P.2d 391, 145 A.L.R. 349], it is stated: ''Plaintiff argues that in order to authorize the disregard of a corporate entity the evidence must be convincing and satisfactory and that a presumption of separate entity is present. However that may be, such rules are for the guidance of the trier of fact, and the rule on appeal is the same as in other cases; the conclusion of the trier of fact will not be disturbed if it is supported by substantial evidence. The same principle is pertinent in analogous instances involving the proof of fraud. (See 12 Cal.Jur. 834.)''

With these rules in mind, we turn directly to the problem here presented, namely, whether, as a matter of law, it should be held that this corporation was so underfinanced that to recognize the corporate entity would be to work a fraud on creditors of the company. There can be no doubt that the fact, if such be the fact, that a corporation is organized with an obviously inadequate capital setup, such fact may be considered in determining whether the corporate entity should be disregarded. Professor Ballantine in his work on Corporations (1946 ed.) at page 302 has the following to say on this subject: ''If a corporation is organized and carries on business without substantial capital in such a way that the corporation is likely to have no sufficient assets available to meet its debts, it is inequitable that shareholders should set up such a flimsy organization to escape personal liability. The attempt to do corporate business without providing any sufficient basis of financial responsibility to creditors is an abuse of the separate entity and will be ineffectual to exempt the shareholders from corporate debts. It is coming to be recognized as the policy of the law that shareholders should in good faith put at the risk of the business unincumbered capital reasonably adequate for its prospective liabilities. If the capital is illusory or trifling compared with the business to be done and the risks of loss, this is a ground for denying the separate entity privilege.'' (The problem is generally discussed in *Hanson* v. *Bradley*, 298 Mass. 371 [10 N.E.2d 259]; *Eastern Products Corp.* v. *Tennessee Coal, Iron & R. Co.*, 151 Tenn. 239 [269

S.W. 4, 40 A.L.R. 1483]; 51 Harv.L.Rev. 1373; 31 Cal.L.Rev. 426.) The problem usually arises where a parent company, itself adequately financed, inadequately finances a subsidiary, and thus the stockholders seek to secure double insulation from liability, or where a stockholder seeks to become a preferred creditor of the corporation, or where some direct element of fraud is present. (*Dixie Coal Min. & Mfg. Co.* v. *Williams,* 221 Ala. 331 [128 So. 799]; *Mosher* v. *Salt River Valley W. U. Assn.,* 39 Ariz. 567 [8 P.2d 1077]; *Christian & Craft Grocery Co.* v. *Fruitdale Lumber Co.,* 121 Ala. 340 [25 So. 566]; *Shea* v. *Leonis,* 14 Cal.2d 666 [96 P.2d 332]; *Hanson* v. *Bradley,* 298 Mass. 371 [10 N.E.2d 259]; see general discussion 39 Yale Law Journal 193; Latty, Subsidiaries and Affiliated Corporations (1936), chaps. V and VIII.) The rule is applied, if applied at all, with great caution as to one-man corporations.

We think the proper rule is that inadequate financing, where such appears, is a factor, and an important factor, in determining whether to remove the insulation to stockholders normally created by the corporate method of operation. But in such a case it is incumbent upon the one seeking to pierce the corporate veil to show by evidence that the financial setup of the corporation is just a sham, and accomplishes injustice. In the instant case the plaintiff made no such showing. He not only failed to show, as a fact, that the corporation was inadequately financed, but failed to show any causal connection between the financing and the injury. We cannot say, under the evidence, that the finding that the corporate form of business was not adopted for the purpose of injuring third persons is unsupported.

The judgment appealed from is affirmed.

Ward, J., and Bray, J., concurred.

A petition for a rehearing was denied October 13, 1948, and appellant's petition for a hearing by the Supreme Court was denied November 8, 1948.