[Civ. No. 25049.   Second Dist., Div. One.   Sept. 1, 1961.]

GEORGE E. BARRETT et al., Plaintiffs and Appellants, v. HAMMER BUILDERS, INC. (a Corporation) et al., Defendants and Appellants.

306

McCarthy & Taylor and Ralph E. McCarthy for Plaintiffs and Appellants.

Jack H. Berkowitz for Defendants and Appellants.

FOURT, J.—Defendants appeal "from the judgment . . . in favor of the plaintiffs . . . and from the whole thereof." Plaintiffs appeal "from those parts of the judgment . . . listed hereafter: I . . . as decrees and adjudges that plaintiffs take nothing . . . against the defendants Charter Builders, Inc., Samar Developers, Inc., Mark Oppenheim, and Samuel Oschin. II . . . as reduces the damages of each individual plaintiff, by a sum fixed by the court as the benefit to said plaintiffs of possession of the respective properties. III . . . as requires plaintiffs to accept cash receipts from any creditors having a lien on any of the improvements or additions put on the properties by the respective plaintiffs to the extent of any outstanding indebtedness thereon so paid hereafter by the defendants, and to credit defendants to the extent of any such payments made hereafter, for which receipts are delivered, against the judgment herein for such respective plaintiffs."

A résumé of some of the facts is as follows:

Defendants (subdividers) filed a written notice of intention to sell subdivided lands with the Real Estate Commissioner. (Bus. & Prof. Code, § 11010.) The commissioner in turn issued a public subdivision report. The lots and homes in the subdivision were to be approved and qualify for a Federal Housing Administration (F.H.A.) or Veterans Administration (V.A.) guaranteed or insured loan before sale; the homes were to be sold by the grant deed, trust deed type of conveyance and the defendants were to notify the commissioner before any changing of the offering.

Defendants subsequently altered the construction of the homes and changed the type of conveyancing to the use of a deposit receipt and conditional sales contract. They failed to notify the commissioner of these changes. (Bus. & Prof. Code, § 11012.) Defendants sold homes in this manner to each of the plaintiffs.

Defendants gave each of the individual plaintiffs a copy of the original public subdivision report which in effect informed plaintiffs that the homes were V.A. and F.H.A. approved as certified by the commissioner. Under the contracts that were entered into the plaintiffs advanced moneys toward the purchase price, taxes and improvements, and improving the property.

From the date of the initial subdivision report in 1956 up to February 1958, the defendants made no contact with the commissioner's office. Not until the entire tract was sold did they notify the commissioner of the changes.

Defendants had actual knowledge to the effect that the law required that copies of any contract of sale used by them should have been filed with the commissioner's office. Also, the defendants knew that any change from their original notice of sale could only be made after notification to the commissioner.

After the entire tract had been sold, the defendants, in February 1958, obtained an amended subdivision report from the commissioner. This amended report differed from the original report in several respects. First, the representation that defendants held title was dropped and the purchasers were warned to see the recorded restrictions. (Note: There is no evidence of any infirmity of the title.) Secondly, the method of impounding receipts for protection of purchasers was altered. The impound account was changed from that provided in Business and Professions Code section 11013.2, subdivision (a) to that as set forth in section 11013.4, subdivision (a). Thirdly, the representation that the homes were F.H.A. and V.A. approved was dropped. Fourthly, the public report included the statement that the homes were being sold on contracts of sale and the purchasers were directed to read the contracts carefully before entering into a transaction for purchase of the homes. Finally, the purchasers were warned to contact the Department of Health regarding the condition of the septic tanks in the houses.

I. *Purpose of the Provisions of Section 11000 et seq. of the Business and Professions Code:*

██ The legislative purpose is to protect individual members of the public who purchase lots or homes from subdividers and to make sure that full information will be given to all purchasers concerning public utility facilities and other essential facts with reference to the land. (*Westbrook* v. *Summerfield, Roberts etc., Inc.,* 154 Cal.App.2d 761, 766 [316 P.2d 691].)

II. *Effect of Noncompliance with Sections 11010[1] and 11012[2] of the Business and Professions Code:*

██ Failure to comply with the statutory requirements renders the agreement of sale void. (*Murphy* v. *San Gabriel*

---

[1]Section 11010. Notice of intention to sell or lease.
"Prior to the time when subdivided lands are to be offered for sale or lease, the owner, his agent or subdivider shall notify the commissioner in writing of his intention to sell or lease such offering.

[2]See footnote 2 on following page.

*Mfg. Co.*, 99 Cal.App.2d 365 [222 P.2d 85].) The word "void" as used in this context means that the purchaser can either affirm the agreement and perform according to its terms[3] or disaffirm the agreement and recover the sums he has paid less any allowable offsets. (*Perkins* v. *Sommers*, 117 Cal.App.2d 32, 34 [254 P.2d 913].)

III. *Effect of Subsequent Compliance with Statutory Provisions*:

■ As indicated in the statement of facts, it was only after the entire tract was sold that the defendant notified the commissioner of the changes and obtained an amended subdivision report.

Appellants' (defendants) position is that the "failure to notify the Commissioner was wrongful to the Commissioner, not to the buyer since the buyers intended to procure the homes on the offered terms. The error to the Commissioner was corrected when the sales contract was furnished to and approved by the Commissioner. The illegality claim, if any, should rest with the Commissioner and not the buyers." They further assert that the subsequent filing and the amended subdivision report "ratified" the prior sales.

The appellants' (defendants) position is not well taken. It is obvious that the Legislature contemplated that sub-

---

"The notice of intention shall contain the following information:

" (a) The name and address of the owner.

" (b) The name and address of the subdivider.

" (c) The legal description and area of lands.

" (d) A true statement of the condition of the title to the land, particularly including all encumbrances thereon.

" (e) *A true statement of the terms and conditions on which it is intended to dispose of the land, together with copies of any contracts intended to be used.*

" (f) A true statement of the provisions, if any, that have been made for public utilities in the proposed subdivision, including water, electricity, gas and telephone facilities.

" (g) Such other information as the owner, his agent, or subdivider, may desire to present." (Emphasis added.)

[2]Section 11012. Change in setup of offering; notice.

"It is unlawful for the owner, his agent, or subdivider, of the project, after it is submitted to the Real Estate Division, to materially change the setup of such offering without first notifying the Real Estate Division in writing of such intended change."

[3]The party violating the statute "would be estopped from asserting the invalidity of the agreement, due entirely to his failure to comply with the law. (*Eberhard* v. *Pacific Southwest L. & M. Corp.*, 215 Cal. 226 [9 P.2d 302]; *Security-First National Bank* v. *J. G. Ruddle Properties, Inc.*, 218 Cal. 435 [23 P.2d 1016]; *Bliss* v. *California Coop. Prod.*, 23 Cal.App.2d 245 [72 P.2d 885]; *Hedlund* v. *Sutter Med. Service Co.*, 51 Cal.App.2d 327 [124 P.2d 878].)" (*Perkins* v. *Sommers, supra*, 117 Cal.App.2d 32, 34.)

dividers and others would provide the Real Estate Commissioner with the pertinent information *prior* to the time when the subdivided lands would be offered for sale. Section 11010 of the Business and Professions Code expressly so states.

Section 11012 of the Business and Professions Code requires the subdivider to notify the commissioner of any changes in the offering. It is clear that the legislative purpose of protecting the public would not be effectuated by permitting a subdivider to circumvent the legislative mandate.

■ As stated in *Westbrook* v. *Summerfield, Roberts etc., Inc., supra,* 154 Cal.App.2d 761, 766:

"The purpose of the scheme of state regulation is to protect the buying public. The commissioner may forbid sales or leases to prevent fraud. *The requirements of section 11012 are mandatory that owner or subdivider not change the setup after it is submitted to the Real Estate Division without first notifying the division in writing.* (*Murphy* v. *San Gabriel Mfg. Co.,* 99 Cal.App.2d 365, 367 [222 P.2d 85]; *In re Sidebotham,* 12 Cal.2d 434, 436 [85 P.2d 453, 122 A.L.R. 496].)" (Emphasis added.)

IV. *Effect of Attachment on Plaintiffs' "Tort" Recovery*:

■ The trial court indicated in its "MEMORANDUM OF OPINION" filed August 28, 1959, that it was awarding plaintiffs a *tort recovery* (i.e., based upon plaintiffs' detriment).

Defendants' (appellants) contention is that the levy of an attachment bars recovery in tort.

The chronology of events is generally as follows:

On May 5, 1958, plaintiffs filed their "COMPLAINT FOR DECLARATORY RELIEF; FRAUD; RECISSION [*sic*]; RESTITUTION; INJUNCTION; MONEY HAD AND RECEIVED; DAMAGES."

Defendants' "ANSWER TO COMPLAINT" was filed November 14, 1958. Included therein was a counterclaim based upon the fact that the plaintiffs "resided in, occupied and used the house and premises purchased by each defendant as alleged in their complaint, and that the plaintiffs and each of them are still residing in, using and occupying said premises." It was then alleged that the "reasonable rental value of each of the homes and lots so occupied and used by the plaintiffs as aforesaid is the sum of $150.00 per month, and that such sum is unpaid."

On April 9, 1959, the "PRE-TRIAL CONFERENCE ORDER" was filed. It incorporated the joint pretrial statements of the plaintiffs and defendants. The "JOINT PRE-TRIAL STATEMENT" prepared by Mr. Berkowitz, attorney for the defend-

ants, and signed by both plaintiffs' attorney and defendants' attorney, set forth the issues as:

"(1) Whether the said Contracts of Sale were in violation of Business and Professions Code §§ 11010 and 11012.

"(2) Whether the Contracts of Sale were Illegal.

"(3) If said Contracts of Sale are in violation of the above statutes, the amount of set-off for use and occupation which the defendants are entitled to.

"(4) The amounts spent by the plaintiffs on improving their properties and the amounts paid by plaintiffs pursuant to the Contracts of Sale.

"(5) Whether the plaintiffs are entitled to any recovery for sums spent on improving the property and sums paid pursuant to the terms of the said Contracts.

"(6) Whether defendants furnished plaintiffs a copy of the Final Subdivision Report prior to the time plaintiffs entered into the pleaded Deposit Receipts and Contracts of Sale.

"(7) Whether defendant Mark Oppenheim had a valid real estate agents' license at the time of the execution of the pleaded Deposit Receipts.

"(8) Whether the defendant Samuel Oschin acted on behalf of himself individually or whether he was merely acting as an officer and agent of the defendant corporations."

The "JOINT PRE-TRIAL STATEMENT" prepared by Mr. McCarthy, plaintiffs' attorney, and signed by both himself and the defendants' attorney, set forth the issues as follows:

"(1) Whether the contracts and/or deposit receipts of each of the plaintiffs attached to the complaint, are wholly illegal and void and of no force and effect whatsoever, as being in non-compliance with the Business and Professions Code sections above referred to.

"(2) If said contracts are illegal and void, what damages are the plaintiffs entitled to recover, and what is the amount of each of said items of damage.

"(3) If said contracts are illegal and void, and if said plaintiffs are entitled to a recovery of damages, what amount, if any, are the defendants entitled to by way of offset against the plaintiffs' claim."

A minute order discloses that the trial of this matter began on May 12, 1959. The minute order of July 1, 1959, provides in part that the "case is submitted to the Court for its consideration and decision and now stands submitted."

On August 17, 1959, subsequent to the case's being sub-

mitted but prior to judgment, plaintiffs filed an "Undertaking on Attachment" and an "Affidavit for Attachment Against Resident C. C. P. Sec. 538" wherein it was stated in pertinent part as follows:

". . . [T]he defendants in said action are indebted to the Plaintiffs in the sum of TWENTY FIVE THOUSAND ($25,000.00) Dollars, lawful money of the United States, over and above all legal set-offs and counter-claims, upon an *implied contract, for the direct payment of money,* to-wit: *Implied contract for repayment of sums advanced on contract of sale of real property. . . .*" (Emphasis added.)

Plaintiffs obtained two writs of attachment. The first "WRIT OF ATTACHMENT C.C.P., 540-560" was directed to "the Sheriff of the County of VENTURA." The second "WRIT OF ATTACHMENT C.C.P., 540-560" was directed to "the Sheriff of the County of LOS ANGELES."

The writ issued to the Sheriff of Ventura County was returned unsatisfied. However, on August 19, 1959, levy was made on the bank account of some of the defendants by the Sheriff of Los Angeles County.[4] The "ANSWER TO GARNISHMENT" discloses that levy was made upon $8,617.07.

On August 24, 1959, defendants filed a "NOTICE OF MOTION TO DISCHARGE ATTACHMENT." On the same date plaintiffs filed their "PLAINTIFF'S [*sic*] POINTS AND AUTHORITIES IN OPPOSITION OF MOTION TO DISCHARGE ATTACHMENT" and an "AMENDED AFFIDAVIT FOR ATTACHMENT AGAINST RESIDENT."

In the amended affidavit, plaintiffs again alleged "That the defendants in said action are indebted to the plaintiffs in the sum of $25,000.00, lawful money of the United States, over and above all legal set offs and counterclaims, upon an *implied contract for the direct payments of money, to wit, an implied contract for repayment of sums advanced pursuant to contracts for sale and purchase of real property . . .*" (Emphasis added.)

The minute order of August 24, 1959, provides in part as follows:

". . . good cause appearing therefor, it is by the Court ordered, pursuant to stipulation of respective counsel, that

---

[4]In the "PLAINTIFFS RESPONDENTS' BRIEF" it is denied that a writ of attachment was levied. Defendants, pursuant to rule 12 of Rules on Appeal made "APPLICATION TO AUGMENT AND CORRECT RECORD ON APPEAL" which was granted. The writ of attachment directed to the Sheriff of Los Angeles County, the "RETURN OF GARNISHMENT" and the "ANSWER TO GARNISHMENT" were brought before this court.

said attachment be withdrawn, as set forth in the written stipulation to be filed herein.''[5]

On August 28, 1959, the trial court filed its ''MEMORANDUM OF OPINION.'' Therein the court indicated that those of the plaintiffs who had pleaded causes of action sounding in fraud and deceit had failed to meet their burden of proof, and that it was awarding plaintiffs a ''tort'' recovery.[6]

---

[5] On October 26, 1959, a stipulation was filed wherein the parties stipulated ''that of the 24th day of August, 1959, plaintiffs may withdraw his [sic] attachment issued in the above entitled matter, and that in consideration thereof, defendants, and each of them, waive any costs and any claim or causes of action or damage for wrongful attachment, arising from said attachment, and that any attachment bond in force may be exonerated.''

[6] ''With this question of fraud disposed of, it leaves the case with all plaintiffs asking for the following relief in their remaining causes of action:

''A declaration that the contracts for the purchase of homes . . . are void as against the purchasers and an award of damages . . . *In his argument at the close of trial counsel for plaintiffs urged that the claims for damages sounded in tort,* the tort being the violation of the subdivision statute enacted for the benefit of the public of which plaintiffs are all members. As counsel for plaintiffs put it in their briefs, 'The gist of the action is to compensate plaintiffs for the detriment resulting from an unlawful act committed by defendants . . .' Then counsel for plaintiffs further states as follows: '*The right of action is given by Civil Code Section 3281 expressly, and the measure is detriment, not restitution or rescission. . . .*'

''Since plaintiffs have limited themselves to this theory, their right of recovery, if any, must be examined under this hypothesis and the award, if any, limited to that which properly can be given under such theory. It might be pointed out that the plaintiffs could well have established a case under the doctrine of rescission had they chosen to do so . . .

''. . . *The question then is what rights flow to the plaintiffs under the tort theory pursuant to which they have chosen to present their claims to the Court.*

''. . . [*U*]*nder their causes of action for declaratory relief, I believe they are entitled to a declaration that the contracts of sale are unenforcible as against them* . . . I do not believe it was essential that plaintiffs set up a cause of action for declaratory relief. I think the finding that the contracts were unenforcible because of illegality could have been made in a simple action for damages. . . . I do not see anything inconsistent in plaintiffs asking for a declaration of unenforcibility or voidness based on illegality and then saying, this matter having been established judicially, now we wish legal damages based on our tort claim. Looking at it this way, and ignoring any claims the defendants are making as to a right of offset, it seems to me that it is reasonable and proper to gauge what has been plaintiffs' 'net' damage. By this I mean that we must take into consideration the circumstances that the wrongful act of the defendants (that is, the act of the selling homes to the plaintiffs without having properly complied with the subdivision statute) both cause plaintiffs a detriment and conferred on them a benefit.

''*The detriment suffered is composed, in part of the expenditures made or to be made by the plaintiffs in meeting down payments and progress*

On January 29, 1960, the "FINDINGS OF FACT AND CONCLUSIONS OF LAW" were filed, and on February 2, 1960, "JUDGMENT" was filed and entered.

On February 15, 1960, defendants' "NOTICE OF INTENTION TO MOVE FOR NEW TRIAL" was filed. The four grounds set forth therein were: "(1) Excessive damages appearing to

payments on the property, in moving in and out of the homes, in improving the homes, and in paying taxes. Another possible detriment would be any monetary loss occasioned by the present necessity of the plaintiffs to purchase other homes which, because of the change of market conditions in the interim, might now cost them more. Finally there would be the further item of detriment that would be occasioned by the loss of earning power of the funds expended by plaintiffs during the interval between the time of purchase of the homes from the defendants and the final decision in this case which classically is compensated for by an award of interest.

"The benefit which plaintiffs received was the right to occupy the homes which were the subject matter of the illegal contracts for a considerable period of time without ultimately (because of the effect of this decision) having to pay any consideration therefor. . . .

". . . [I]t can be said that plaintiffs' net damage would be the difference between the expenditures and losses above recited and the value to the plaintiffs (not to the defendants) of the occupation of the homes. . . .

"I think it is clear from the comments I have made so far in this memorandum that the findings and conclusions on damages are in no way dependent upon a counter claim for offset by the defendants. *Had the plaintiffs' case been one for rescission, I believe that some counter claims should have been honored.* . . .

"The problem remains of giving my views on amounts which can be taken into consideration on the detriment side to get the net damage figure. . . . There should be no problem about the first group of items. These are the down payments, the progress payments and the taxes. . . .

"Another group of items deserves some additional comment. These are the sums paid out by the respective plaintiffs for so-called improvements. . . . *It seems to me plaintiffs should be entitled to reimbursement of all sums paid out regardless of whether the items became fixtures or improvements or did or did not enhance the value of the property.* . . .

"The next items to take up are the moving costs. As I understand it, plaintiffs are asking only for moving out expenses, although it seems logical that both the cost of moving in and the cost of moving out would be items of detriment which should be taken into account, since both moves would have been made as an incident to the fact that the contract was entered into but later was declared repudiated because illegality terminated the possessory interest of the plaintiffs. In light of plaintiffs' position I will take into consideration only moving out costs. . . .

"I turn next to the question of possible detriment due to the increased cost of buying another home to replace that one involved in the illegal contract. . . . [C]ounsel for plaintiffs mentioned that his clients were not seeking recovery for anything involving the factor of appreciation. . . . (as) to the contention of detriment caused by now having to buy a similar type house at a higher price . . . I am satisfied to let the matter stand on the testimony of Mr. Strickland that there is no factor of higher cost of purchase to be taken into consideration.

"This leaves as the final element of detriment which I thought should be taken into consideration, the point of whether interest should be allowed on the expenditures made. . . . [A]n award of interest would

have been given under the influence of passion or prejudice. (2) Insufficiency of evidence to justify the decision and judgment. (3) Said judgment is against law. (4) Error in law occurring at the trial and excepted to by plaintiffs [*sic*]."

The motion for new trial was argued and submitted on March 7, 1960. On March 31, 1960, the trial court denied the motion and modified the judgment. A "MEMORANDUM OF OPINION RE MOTION FOR A NEW TRIAL" was filed. The court again indicated that it had applied a tort theory.[7]

The modified "FINDINGS OF FACT AND CONCLUSIONS OF LAW" were filed April 27, 1960. "JUDGMENT" was filed and

---

seem to be in order even though the case was being decided on a *tort basis*. . . . This would include down payments, progress payments and taxes. It would not embrace, as I view it, monies or times expended on improvements or sums allocated to moving costs . . . The calculation as to each allowed item should be for a period extending from the date the expenditure was made to the date of judgment. . . .

"This leaves one further item for comment. Up to this point I have been endeavoring to calculate the net damage of each plaintiff without regard to any asserted counter claim of the defendant. I do not feel that the defendants, under the basis of this decision, are in a position to contend for a counter claim as such against any of the plaintiffs for any loss accruing to the defendants simply because of the making of the contract, which would include the normal wear and tear of occupancy of the premises. However, if any of the plaintiffs damaged any of the particular houses or parts thereof beyond normal wear and tear, I am of the opinion that the defendants have a legitimate claim on their counter suit. . . ." (Emphasis added.)

[7]". . . Under the tort theory upon which the case was decided by me, the measure of damages is not the value of the improvements of the defendants (which might be the situation under a rescission or possibly under an unjust enrichment theory) but rather, what the plaintiff actually expended on the work; . . ."

"3. CONTENTION THAT IT WAS ERRONEOUS TO ALLOW A RETURN OF EXPENDITURES ON ADDITIONS TO THE HOUSES.

"Counsel for defendants in his opening remark under this heading, indicates that his contention is based on the claim that rescission is the only proper remedy. The argument is made that although the improvements were put in and money was spent on them by the plaintiffs, in fact, they did not enhance the value of the property in the hands of the defendants and therefore, if rescission were to take place, the defendants have received nothing of value therefrom which should be returned. However this argument would not apply to tort recovery. There the plaintiffs are entitled to be made good for the detriment they have suffered. What they paid, within reason, as suggested above, was a detriment whether or not it raised the market value as far as defendants were concerned. Therefore I believe my ruling on improvements to be consistent with the fundamental basis for my judgment. This determination should not be changed *unless it should develop in some future proceeding that I was incorrect in granting relief on the tort theory*. Discussion on this point follows under a subsequent heading. . . .

"*Even if I am wrong on the tort theory or the proximate cause problem, plaintiffs should be entitled to recover on their unjust enrichment causes of action although their measure of damages might be somewhat different*." (Emphasis added.)

entered April 28, 1960. Defendants' motion for new trial was denied.

We believe that under the facts of this case, the trial court erred in awarding plaintiffs recovery based upon a tort theory. As indicated above, plaintiffs availed themselves of the provisional remedy of attachment. By so doing, they pursued a course of conduct inconsistent with tort recovery. (*J. C. Peacock, Inc.* v. *Hasko,* 184 Cal.App.2d 142, 153 [7 Cal.Rptr. 490].)

The levy of attachment interfered with defendants' possession of their property. Plaintiffs resisted the attempt to release the attachment by requiring a hearing and by filing points and authorities attempting to secure themselves. By their affidavit for the writ, and after objection was raised to the writ, by the amended affidavit plaintiffs swore that the cause of action was in "implied contract for repayment" of money.

Defendants were deprived of the use of their money by the writ, and plaintiffs are thereby estopped from claiming there was not an election of remedy. ██ The obtaining and levy of a writ of attachment is an election of a contract remedy and estops plaintiffs from seeking relief on a tort theory of liability. (*Eistrat* v. *Brush Industrial Lumber Co.*, 124 Cal. App.2d 42 [268 P.2d 181] ; *Acme Paper Co.* v. *Goffstein,* 125 Cal.App.2d 175, 179 [270 P.2d 505], "So far as the judgment here makes an award in the tort measure of damages it must be held to be erroneous, but this does not mean that the entire judgment must fall.")

Having determined that the trial court erred in awarding a "tort" recovery, we now turn to the contentions raised by plaintiffs in their limited appeal from the judgment.

First, plaintiffs assert that the defendants are not entitled to any offsets against plaintiffs' claims. This contention is answered in Point II of the opinion, *supra,* wherein it is stated that "the purchaser can either affirm the agreement and perform according to its terms *or disaffirm the agreement and recover the sums he has paid less any allowable offsets. (Perkins* v. *Sommers, supra,* 117 Cal.App.2d 32, 34.)" (Emphasis added.)

Next plaintiffs assert that the trial court should have used a different basis for offset. It is unnecessary to determine whether the trial court used the correct basis for offset since the court erred in permitting a tort recovery.

Third, while the notice of appeal indicates that plaintiffs appeal from those parts of the judgment . . . "III . . . as requires plaintiffs to accept cash receipts from any creditors . . ." this matter is not presented on their appeal.

■ Finally, the issue is raised as to whether the trial court erred in rendering judgment in favor of defendants Sam Oschin, Mark Oppenheim, Charter Builders, Inc., and Samar Developers.

Insofar as defendants Charter Builders, Inc., and Samar Developers, the evidence indicates that none of the plaintiffs contracted with either of these corporations.

Plaintiffs George E. and Muriel G. Barrett contracted with defendant Prodigal Builders, Inc. (hereinafter referred to as Prodigal). Sam Oschin was president of Prodigal (i.e. and also president of all the defendant corporations), but this fact alone would not render him personally liable.

The "AGREEMENT FOR SALE OF REAL ESTATE" between the Barretts and Prodigal was signed "PRODIGAL BUILDERS, INC. by SAMUEL OSCHIN."

It is clear that Sam Oschin was contracting on behalf of Prodigal and not for himself. As stated in *Carlesimo* v. *Schwebel,* 87 Cal.App.2d 482, 486-487 [197 P.2d 167]:

". . . [T]he contract discloses, on its face, that the corporation was a contracting party. Certainly the trial court from such evidence could infer, reasonably, that appellant had knowledge of the existence of the corporation prior to and at the time the contract was executed.

"The real question on this phase of the case is not whether appellant knew that the corporation was a party, but whether, before an agent will be released from liability on a contract executed on behalf of a corporation, the contract must not only disclose the name of the principal but must also, on its face, disclose the fact that the agent is signing in a representative capacity. In the present case, had Schwebel appended the preposition 'by' immediately before his signature, there would be no doubt at all that the contract would have disclosed, on its face, not only that appellant was dealing with the corporation, but that Schwebel was signing as an agent and not as a principal. Where that appears on the face of the contract the corporation is liable and the agent is not. (*Armour & Co.* v. *Rosenberg & Sons Co.,* 36 Cal.App. 773 [173 P. 404]; *Greve* v. *Taft Realty Co.,* 101 Cal.App. 343 [281 P. 641].)"

What is set forth above is also pertinent in relation to

plaintiffs Ysmael C. and Toni C. Gonzales' contract with Hammer Builders, Inc. (hereinafter referred to as Hammer); plaintiffs Duane D. and Helen B. Anderson's contract with Prodigal; plaintiffs Robert L. and Marjorie B. Barnum's contract with Hammer; plaintiffs Robert B. and Stella Manning's contract with Prodigal; plaintiffs Dewell J. and Concetta Cooper's contract with Prodigal; plaintiffs Vern J. and Edith O. Louk's contract with Prodigal; plaintiffs Floyd L. and Betty Mae Peters' contract with Prodigal; and plaintiffs Joseph E. and Helen J. Wolfe's contract with Prodigal.

In each instance the trial court found that the particular plaintiffs had contracted with the particular defendant, and then properly rendered judgment in favor of the particular plaintiffs and against the corporation and broker with which the particular plaintiffs had dealt.

The matter is remanded to the trial court for a proper determination of damages.

Wood, P. J., and Lillie, J., concurred.