Filed 8/17/15  Enciso v. Aardema CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| GILBERT L. ENCISO,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>PETER AARDEMA,<br><br>    Defendant and Appellant. | D065872<br><br><br>(Super. Ct. No. 37-2013-00044341-<br>  CU-BC-CTL) |

APPEAL from a judgment of the Superior Court of San Diego County, Joel M. Pressman, Judge.  Reversed.

David A. Kay for Defendant and Appellant.

Law Office of Martin N. Buchanan, Martin N. Buchanan; The O'Brien Law Firm and John J. O'Brien for Plaintiff and Respondent.

Plaintiff and respondent Gilbert L. Enciso is a licensed real estate broker who had a business relationship with defendant and appellant Peter Aardema, who managed his family trust's real estate holdings (the Peter and Ladene Aardema Trust, or "Aardema").  Enciso prevailed at a bench trial on his breach of contract theories, alleging he was personally entitled to recover commissions under two exclusive listing agreements for the lease of two of Aardema's commercial properties (the listing agreements).  The listing

agreements had been entered into between Aardema and Enciso's personal Subchapter S corporation, Torrey Pines Commercial, Inc. (Torrey Pines), which did not have its own broker's license.[1]

In another complaint filed a year previously, which was consolidated with this action, Torrey Pines, on its own behalf, had sued Aardema on the same two listing agreements. Using the earlier superior court case number, 37-2012-00101866-CU-BC-CTL, the trial court granted Aardema's motion for judgment on those pleadings, because Torrey Pines was not a licensed real estate broker and was therefore not entitled to recover commissions under Business and Professions Code section 10136.[2]

At the current bench trial on Enciso's individual claims against Aardema, the trial court found in favor of Enciso on all three of his contract related causes of action, as to both properties that were the subjects of the listing agreements. (Consolidated case no. 37-2013-00044341-CU-BC-CTL.)[3] The court determined the listing agreements were

---

[1]     Under the Internal Revenue Code (IRC), title 26 United States Code sections 1361(a) and 1362(a)(1), a small business corporation may make an election to become an "S corporation" that does not pay corporate income taxes and that instead reports its corporate profits or losses through stockholders in their individual returns. (Rev. & Tax. Code, § 23800 [federal tax treatment of "S corporations" and their shareholders shall apply, except as otherwise provided]; see pt. II B., *post*.)

[2]     All statutory references are to the Business and Professions Code unless otherwise specified. Section 10136 provides: "No person engaged in the business or acting in the capacity of a real estate broker or a real estate salesman within this State shall bring or maintain any action in the courts of this State for the collection of compensation for the performance of any of the acts mentioned in this article without alleging and proving that he was a duly licensed real estate broker or real estate salesman at the time the alleged cause of action arose."

2

integrated and should be read on a plain language basis, and it made a finding of fact that Enciso was acting "as and through his S corporation, Torrey Pines." The trial court awarded Enciso all commissions he requested, thus rejecting Aardema's contentions that (1) Enciso was statutorily barred from maintaining this individual action on the listing agreements entered into by his unlicensed corporation, Torrey Pines, and (2) Enciso had been adequately paid for the actual services he rendered.

In large part, the trial court relied on case law, *Estate of Baldwin* (1973) 34 Cal.App.3d 596, 599-600 (*Baldwin*), to rule that Enciso could recover compensation on the corporation's listing agreements, because he had a broker's license and was acting "as and through" his personal corporation. *Baldwin* was an action in probate court in which an award of a brokerage commission to an individual licensed real estate broker was upheld, even though the sale documents had named his unlicensed corporation or dba (doing business as) as the broker; the appellate court determined that the documents and pleadings were equivalent to a written contract with the estate, the broker had made full disclosures about his dual role as originating broker as well as a proposed purchaser, and the probate court had an adequate basis to confirm the sale and to compensate the broker for his services. (*Id*. at p. 605; *Schantz v. Ellsworth* (1971) 19 Cal. App. 3d 289, 291-293 (*Schantz*) [§ 10136 did not preclude maintenance of action for compensation by individual holding a valid broker's license, although he had failed to obtain branch office

---

3      Although the trial court in its judgment recites that the Enciso claims went to trial under the later case number in the consolidated case (37-2013-00044341-CU-BC-CTL), the judgment and the notices of appeal were filed under the original superior court case number (37-2012-00101866-CU-BC-CTL). Since the two cases were consolidated, we utilize the later case number for our records on appeal.

3

or fictitious business name licenses; purpose of the real estate licensing law, to protect public from incompetent/untrustworthy brokers, was satisfied by proof of individual's license under those circumstances].)

On appeal, Aardema argues the trial court erred in its statutory, case law and contract interpretation, and the judgment in favor of Enciso is unsupported by any of the theories he pursued (breaches of contract or covenant of good faith and fair dealing, or promissory estoppel). Aardema contends that the trial court incorrectly disregarded the statutory requirement that the contracting party, Torrey Pines, have a broker's license, and the court impermissibly equated the S corporation with its licensed owner, but without any sufficient basis to disregard the corporate entity on an alter ego basis. (§ 10136; *Cooperman v. Unemployment Ins. Appeals Bd.* (1975) 49 Cal.App.3d 1, 7 (*Cooperman*) [corporate entity may be disregarded in some situations, to prevent fraud or grave injustices]; see *Opp v. St. Paul Fire & Marine Ins. Co.* (2007) 154 Cal.App.4th 71, 75 (*Opp*) [issue is not who does the work, but who is engaged in business or acting in contractor's capacity].)

We agree with Aardema that Enciso lacks standing to enforce the listing agreements entered into by his personal corporation, either on his own behalf or by claiming the corporation operated through his license and it was not a separate entity for contracting purposes. Section 10136 controls, and *Baldwin, supra*, 34 Cal.App.3d 596 is distinguishable on several relevant grounds. We reverse the judgment for any appropriate further proceedings, which may include requests to amend the pleadings to assert Enciso's personal rights of recovery, if any.

4

## FACTUAL AND PROCEDURAL BACKGROUND

Both parties observe in their briefs that the essential facts of the transactions were not disputed, and the statement of decision sets forth the facts more or less as they occurred. However, the parties disagree on the legal effect of those events and the conclusions of law to be drawn from this set of facts.

### A

### Background; Previous Action Filed and Consolidated

Enciso, a longtime licensed real estate broker, worked with Aardema on about 30 real estate transactions taking place over 12 years. After a few years of working for Aardema on behalf of another brokerage, Enciso went out on his own and occupied office space at two locations with Aardema. Between 2003 and 2010, Enciso worked out of an office next to Aardema's in a commercial building Aardema owned on Ruffin Road ("Ruffin Road"). Around 2002, Enciso formed Torrey Pines as his own S corporation, for tax reasons, acting as the sole shareholder-principal-employee. Torrey Pines did not have its own real estate broker's license, but it is not disputed that its corporate formalities were observed. Although the record is not entirely clear, the parties do not dispute that Enciso's license was issued in his own name and not in the name of any fictitious entity.

Among other commercial properties, Aardema owned and managed the Ruffin Road property and another commercial property, "Eastgate Drive." Aardema had a practice of using Torrey Pines as his broker for leases at a reduced commission rate offsetting those amounts against Torrey Pines/Enciso's office rent. Out of about 30

5

transactions, he and Torrey Pines used a written listing agreement seven or eight times. Aardema brought Torrey Pines into a transaction if another listing broker were involved, to split the commission.

As of August 2008, the tenant at Eastgate Drive decided to leave. In October 2008, Torrey Pines (acting through Enciso) and Aardema entered into an exclusive listing agreement for leasing the property, for the term of October 7, 2008 through October 6, 2009. The listing agreement provided for a six percent commission of the aggregate lease value for any lease signed during the term. It did not have a "procuring cause" requirement. It did not list any broker's license number. (See *Baldwin, supra,* 34 Cal.App.3d at pp. 600-601, 603-604 [broker Lembi's personal license number appeared in his bidding documents that employed his own dba as the broker].)

On behalf of Torrey Pines, Enciso made some efforts to market Eastgate Drive to prospective tenants. In December 2008, Enciso gave a tour of the property to a client of broker Grubb & Ellis, Vanguard Composites Group, Inc. (Vanguard).

In January 2009, Aardema decided that Enciso was not doing enough and he sent a letter to Torrey Pines and Enciso ("Dear Gilbert") to terminate the exclusive listing agreement. On behalf of Torrey Pines, Enciso wrote Aardema that he did not agree to any premature termination of the listing agreement, and he outlined the work he had done. However, Aardema had already entered into a competing listing agreement with Voit Commercial Brokerage (Voit). Using Voit, Aardema leased the Eastgate Drive property to Vanguard for five years beginning June 2009. The aggregate lease value was

$1,485,219.23. Aardema sent Torrey Pines a $3,000 check dated July 13, 2009, labeled "Vanguard Advance."

Enciso submitted an invoice to Aardema, dated September 1, 2009, for the six percent commission amount on the lease at Eastgate Drive with Vanguard, reflecting the $3,000 payment. This 2009 invoice gave Enciso's new office address, although he testified he did not move there until December 2010, after leaving Aardema's Ruffin Road office suite.

Since 2002, the main Ruffin Road tenant had been Hoya Corporation, Inc. (Hoya), and it wanted to terminate the lease early and move out. On July 6, 2009, Aardema and Torrey Pines (acting through Enciso) entered into an exclusive listing agreement for lease of Ruffin Road (term of July 7, 2009-July 6, 2010). The listing agreement did not exclude new leases with current or prior tenants of the property. It provided for a commission of five percent of the aggregate lease value for any lease signed during the term, without a procuring cause requirement. It also did not list any broker's license number.

Enciso started negotiating with Hoya to replace the existing lease with a new lease agreement for about one third of the property's square footage. Contrary to Enciso's version, Aardema testified that he did the negotiating, but he asked Enciso to prepare the paperwork for the new lease. Torrey Pines drafted the lease proposal dated July 1, 2009 and related documents.

In August 2009, Hoya signed a new seven-year lease with Aardema and the related documents. The aggregate lease value was $1,976,714.34. On two of the deal

7

documents, Aardema crossed out a section allowing payment to a broker. Aardema then paid Torrey Pines compensation in two checks, the first dated August 18, 2009 for $5,000, labeled "commissions Hoya advance." The next check was dated November 3, 2009 for $17,500, labeled "commissions Hoya."

Enciso sent Aardema an invoice dated October 11, 2009 for the five percent commission amount (indicating a balance due and showing an August payment was made). Confusingly, the October 2009 invoice also reflects that another payment was made a month later, in November 2009. In any event, Aardema told Enciso he would have to sue him if he wanted more money.

Acting through counsel, Torrey Pines filed its complaint in August 2012 against Aardema, seeking to recover unpaid commissions under the two listing agreements. In March 2013, while counsel were meeting and conferring, Aardema raised as a defense that Torrey Pines did not have its own real estate license. Enciso unsuccessfully attempted to amend the Torrey Pines complaint, but in April 2013, he filed a separate complaint in his name to recover the same unpaid commissions (the Enciso complaint). The two actions were consolidated.

Aardema moved for judgment on the pleadings on the Torrey Pines complaint, claiming it was defective because it could not allege that Torrey Pines was a licensed broker. The trial court granted the motion. Although Aardema had also moved to strike the separate Enciso complaint, the court denied that motion, stating that Torrey Pines's (defective) claim to the commissions "does not necessarily exclude the possibility that an individual broker worked on behalf of Torrey Pines Commercial. There is authority [e.g.,

8

*Baldwin, supra,* 34 Cal.App.3d at p. 605] that an individual licensed broker may, under certain circumstances, be entitled to recovery of commissions when working on behalf of an unlicensed corporation."

Also in the Torrey Pines action, the court awarded $5,580 for attorney fees and costs in favor of Aardema and against the corporation, pursuant to attorney fees clauses in the listing agreements. In the ruling, the court noted that Enciso, as an individual broker, was still proceeding against Aardema, but that did not prohibit Aardema from recovering the fees he incurred in defending Torrey Pines's action.

### B. Current Complaint; Trial

With respect to each of the two listing agreements, Enciso's complaint sued Aardema on behalf of "the broker parties" (alleged to be Enciso and Torrey Pines) for (1) breach of contract; (2) breach of the implied covenant of good faith and fair dealing; and (3) promissory estoppel. Aardema filed an answer with numerous affirmative defenses, including the individual's lack of standing to sue on an unlicensed corporation's commission contract, and asserting the parties' previous courses of conduct were contrary to Enciso's allegations. (§ 10136.) Other affirmative defenses included limitations, estoppels, and waiver. The issues identified in the joint trial readiness report did not mention any substantial compliance contentions by Enciso, regarding the use of his broker's license by his corporation.

At the bench trial on Enciso's complaint, the court declined to rule on two motions in limine that Enciso filed, including one that sought a determination of parol evidence issues about any potential offsets to the full amount of commissions being claimed (i.e.,

9

from the cooperating brokers in some of the transactions). The court took the position that in limine rulings were unnecessary to get to the facts in this nonjury trial, especially because Aardema was arguing, among other things, that Enciso had made incomplete financial disclosures in a divorce proceeding and was having personal problems in 2009 with alcohol. (Evid. Code, § 352.).

The court heard testimony from both parties and Aardema's employees as witnesses, and received documentary evidence, including the listing agreements and Enciso's marketing records, among other information. Enciso argued that it was a straightforward case about how the two listing agreements provided the measure of the rights of the parties, according to their written terms. He argued that the documents spoke for themselves. He testified that he was licensed as a broker and Torrey Pines was his own corporation, formed for tax purposes. Apparently, no issue was raised about any lack of Torrey Pines's corporate formalities or that it was a defective fictitious business name. (§ 17910.5, subd. (a) [no fictitious business name allowed that includes "corporation" type designation unless the person using name is a validly organized corporation].)

As noted, judgment on the pleadings had previously been entered on the consolidated Torrey Pines complaint, but Aardema's related motion to strike the current complaint was denied. After Enciso's testimony, Aardema again moved for judgment or judgment on the pleadings, arguing the listing agreements were unenforceable because they were with an unlicensed party. (Code Civ. Proc., § 631.8.) The court told counsel that issue had already been visited and the motions were denied.

10

Aardema continued to argue that Enciso as an individual was not a party to the transactions, as he had initially admitted by litigating the case through Torrey Pines, and he therefore lacked standing now. Aardema suggested that the trial court was not paying attention to the concept that a corporation is a legal person or entity recognized as having an existence separate from its shareholders. It was Torrey Pines that had participated in discovery in the consolidated case, not Enciso personally. Aardema alternatively argued that the amounts he had already paid to Enciso as advances were appropriate and sufficient, as measured by quantum meruit for the limited services Enciso had actually performed (document drafting and client interactions), particularly because the commission amounts were not a proper measure of damages. Aardema also contended other defenses applied, including accord and satisfaction, waiver and estoppel, previous course of conduct, and the two and four year statutes of limitations.

After the close of evidence, the trial court requested each party to prepare a draft statement of decision that would also serve as closing argument, and it heard limited argument. Subsequently, the court adopted in full the draft statement of decision as prepared by Enciso, which included as a finding of fact that Enciso, a licensed real estate broker, had acted "as and through his S corporation, Torrey Pines," of which he was the sole shareholder, principal, and employee. The court also ruled the listing agreements were integrated contracts and under the parol evidence rule, it was not proper to admit extrinsic evidence regarding the rates for the commissions or any setoffs to the amounts claimed. (Code Civ. Proc., § 1856, subd. (a).)

The court granted Enciso recovery under each of the listing agreements, on all three alternative causes of action. The court made findings that Enciso had fully performed the services required under each of the listing agreements and there was no procuring cause requirement. Since Enciso was licensed as a real estate broker, he could recover compensation for breach of contract, even though the listing agreements were in another name, because he had performed the services while acting "as and through" his S corporation. The court ruled it would not be violative of the purpose of section 10136 to award him compensation. (*Baldwin, supra,* 34 Cal.App.3d at p. 605 [exact compliance with licensing law not required " 'if it would transform the statute into an "unwarranted shield for the avoidance of a just obligation." ' "].)

The court further found Aardema had breached the listing agreements by failing to pay all commissions due. As to Eastgate Drive, Aardema was found to have prematurely revoked Enciso's exclusive listing without sufficient cause shown, or he had unfairly interfered with Enciso's right to receive the benefits of the contract. As to Ruffin Road, Aardema was found to have breached the agreement by negotiating with Hoya or having others do so during the term of Enciso's exclusive listing agreement, thus interfering with the benefits of the contract. Enciso was deemed to prevail on all elements of (1) breach of contract and (2) breach of the implied covenant of good faith and fair dealing. On the promissory estoppel claim, the same findings of fact and conclusions of law applied as in the contract claims. The court awarded Enciso damages and interest of $127,749.50 for the unpaid commission on Eastgate Drive and $111,901.59 for the unpaid commission on Ruffin Road.

12

Subsequently, the court awarded Enciso costs and attorney fees, so that the total judgment amounted to $299,003.48. Aardema timely appealed. We have augmented the record to include the respective proposed statements of decision.

DISCUSSION

I

*REVIEW OF JUDGMENT BASED ON STATEMENT OF DECISION;*
*ISSUES PRESENTED*

Aardema argues that Enciso's personal breach of contract action impermissibly seeks to recover compensation for Torrey Pines's unlicensed performance of real estate brokerage services. He claims that in the consolidated Torrey Pines complaint, Enciso attempted to hide behind its corporate shield in a manner designed to avoid any responsibility for legal fees and costs related to that lawsuit. Aardema claims that as a matter of law, the judgment on all three contract and/or promissory estoppel causes of action is invalid because Enciso did not show any equitable justification to allow what Aardema calls "self-piercing the corporate shield." (See *Brooklyn Navy Yard Cogeneration Partners, L.P. v. Superior Court (Parsons Corp.)* (1997) 60 Cal. App. 4th 248, 257-258 (*Brooklyn Navy Yard*) [alter ego doctrine applies where there is unity of interest between separate entities and where inequitable results will follow if corporate separateness is respected].)

Aardema thus contends the listing agreements entered into by the unlicensed corporation remain illegal and unenforceable. (§ 10136; *Blank v. Borden* (1974) 11 Cal.3d 963, 969 [real estate broker's right to compensation "must be found within the four corners of his employment contract"; such contracts to be strictly enforced according to

13

their lawful terms].)  At trial, Enciso did not rely on any alternate theories of oral contract or quantum meruit, such as for the drafting services he performed.

Our task is to draw legal conclusions from the given set of facts and documentary evidence.  Generally, an appellate court resolves any conflicts in the evidence or in the inferences to be drawn from the facts, in a manner supporting the trial court's determinations in its statement of decision.  (*In re Marriage of Hoffmeister* (1987) 191 Cal.App.3d 351, 358; *Chapala Management Corp. v. Stanton* (2010) 186 Cal.App.4th 1532, 1535.)  It appears that the trial court made an implied finding that the corporate form could properly be disregarded because Aardema was on actual notice of how Enciso was conducting his business, through a corporate entity.  Such a finding can be upheld only if supported by substantial evidence.  (*In re Marriage of Hoffmeister, supra,* at p. 358.)

Where, as here, the trial court did not consider extrinsic evidence in interpretation of a contract, the reviewing court applies de novo review to the issues of law.  (*Campbell v. Scripps Bank* (2000) 78 Cal.App.4th 1328, 1336.)  We exercise our independent judgment in interpreting the contract language, without giving deference to the trial court's ruling.  (*Ibid.*; *Parsons v. Bristol Development Co.* (1965) 62 Cal.2d 861, 865-866.)  As a basic goal of contract interpretation, the courts seek "to give effect to the parties' mutual intent at the time of contracting.  [Citations.]  When a contract is reduced to writing, the parties' intention is determined from the writing alone, if possible."  (*Founding Members of the Newport Beach Country Club v. Newport Beach Country Club, Inc.* (2003) 109 Cal.App.4th 944, 955 (*Founding Members*).)

14

After taking testimony about the historical facts of the case, the trial court ruled that the listing agreements should be read on their faces as integrated contracts, unambiguously providing for percentage commissions. The court adopted Enciso's theory and proposed finding of fact that although the listing agreements had been entered into between Aardema and Torrey Pines, Enciso was acting "as and through" the S corporation, and thus as plaintiff, he and his S corporation ("the broker parties") could be referred to as "Mr. Enciso," who held a license. We accordingly focus our analysis on the identity of the parties to the contract, in determining the parties' intentions from the terms of the writing. This requires an inquiry into the corporation's role as a contracting party, as well as any special considerations about S corporations. We then turn to the effect of the statutory purposes of the real estate licensing law. (Pt. III, *post*.)

II

*SUBSTANTIVE LAW: CORPORATE IDENTITY*

Enciso essentially seeks to disregard the participation of his corporation in the transactions by relying on authority that has allowed licensed real estate brokers to recover compensation for their services, even where the transaction did not strictly comply with statutory requirements. (*Baldwin, supra,* 34 Cal.App.3d at p. 605; *Schantz, supra,* 19 Cal.App.3d at pp. 292-293.) Before looking to such case law (in pt. III, *post*), we first outline the usual rules about the separateness of a corporate entity from its owner, then compare the basic features of ordinary corporations and S corporations, to determine as a matter of law whether the tax treatment allowed for an S corporation should make any difference here.

15

## A. Corporate Identity and Alter Ego

Enciso testified at trial he was licensed as a broker and he was the only employee of his corporation. He did not otherwise claim or prove that he was a sole proprietorship, nor did he deny that Torrey Pines was a validly formed legal entity separate from its individual owner. (See *Ball v. Steadfast-BLK* (2011) 196 Cal.App.4th 694, 701 [sole proprietorship is not a legal entity separate from the individual owner]; *Twenty-Nine Palms Enterprises Corp. v. Bardos* (2012) 210 Cal.App.4th 1435, 1450 (*Twenty-Nine Palms Enterprises*) [a corporation is a separate legal entity from its shareholders].) Under section 17910.5, subdivision (a), a person may not use a fictitious business name that includes the designation "incorporated," unless the person is validly incorporated. (See *Opp, supra*, 154 Cal.App.4th 71, 75.) The trial court evidently accepted from the pleadings and the documentary evidence that Torrey Pines, a corporation, is a separate legal entity from its only owner-shareholder, Enciso, but it did not find that fact significant for contract analysis.

As a corporation, Torrey Pines was eligible for a real estate license, but it did not obtain one. (§ 10006 ["person" includes corporation]; *Baldwin, supra*, 34 Cal.App.3d at p. 604, citing *Smithson v. Sparber* (1932) 123 Cal.App. 225, 230 [a corporation is a "person" within the meaning of the statute].) Thus, Torrey Pines was not bound by section 10159, providing that if a corporation is licensed to act as a real estate broker through its officer, that officer, while so employed, is "licensed only to act as such for and on behalf of the corporation as an officer." (*Ibid.*; 2 Miller & Starr, Cal. Real Estate (3d ed. 2014) § 4:17, p. 4-55.)

16

As a corporation, Torrey Pines had the capacity to enter into contracts. Where the face of a contract shows it was entered into on behalf of the corporation "by" its agent, the corporation is liable and the agent is not. (*Barrett v. Hammer Builders, Inc.* (1961) 195 Cal.App.2d 305, 317; *Carlesimo v. Schwebel* (1948) 87 Cal.App.2d 482, 487.)

"Corporations, of course, cannot physically perform work; they can only work through human agents and employees. If the issue were who physically 'performed the work,' no corporation could ever perform on a contract at all and there would be no practical reason for [business/professional/corporate contractor's] licenses. [¶] . . . [¶] The issue, then, is not who 'did the work,' but who was 'engaged in the business or acting in the capacity of a contractor.' " (*Opp*, *supra*, 154 Cal.App.4th 71, 74-75.) Section 10157 is entitled, "License authority limited to person licensed," and provides that "[n]o real estate license gives authority to do any act specified in [Chapter 3, Real Estate Regulations] to any person, other than the person to whom the license is issued." Enciso had the broker's authority here.

Equity allows a corporate entity to be disregarded in some situations, to prevent fraud, to protect third persons, or to prevent grave injustices. (*Cooperman, supra*, 49 Cal.App.3d at p. 7.) When a court disregards the separate identity of a corporation or other business entity under the alter ego doctrine, it does not dissolve the entity. (*Mesler v. Bragg Management Co.* (1985) 39 Cal.3d 290, 300.) The fact that an "entity has been disregarded for some purposes does not warrant its being disregarded for all purposes." (*Grant v. Weatherholt* (1954) 123 Cal.App.2d 34, 49; *Cooperman, supra*, at p. 78.)

17

*Cooperman* is an instructive example of when an individual plaintiff is entitled to be considered as one and the same as his professional corporation (of which he was president and sole employee), e.g., for purposes of unemployment compensation eligibility. There the court ruled that substantial evidence supported a decision that the individual plaintiff qualified for unemployment compensation, even though he was nominally employed by his corporation at the same time. "Courts have held that the alter ego doctrine applies not only in cases where the rights of creditors or third persons are involved but also where the rights of shareholders are presented for consideration of the court. [Citation.] . . . Before the acts and obligations of a corporation can be legally recognized as those of a particular person, it must be shown that the individuality and separateness of the corporation and the individual have ended and that it would be unjust to persist in the recognition of a separate entity. [Citation.] A court of equity may use the alter ego doctrine to prevent a 'palpable injustice.' " (*Cooperman, supra,* 49 Cal.App.3d at p. 8.)

In *Cooperman* the court continued the analysis, "The fact that a corporate entity has been disregarded for some purposes in an action does not mean that it will be disregarded for all purposes. [Citation.] Thus, in the present case, the determination that the corporation and Cooperman were one and the same for purposes of unemployment compensation does not mean that Cooperman will necessarily be held personally liable for a tort or contract action brought against his corporation." (*Cooperman, supra,* 49 Cal.App.3d at p. 8.)

18

It is well accepted that " '[p]arties who determine to avail themselves of the right to do business by means of the establishment of a corporate entity must assume the burdens thereof as well as the privileges.' [Citation.] An individual who has obtained the benefits of corporate limited liability will not be permitted to repudiate corporate existence just because the corporation has become an inconvenience." (*Opp, supra*, 154 Cal.App.4th 71, 76; see *Communist Party v. 522 Valencia, Inc.* (1995) 35 Cal.App.4th 980, 994 ["[A]lter ego is used to prevent a corporation from using its statutory separate corporate form as a shield from liability only where to recognize its corporate status would defeat the rights and equities of third parties; it is not a doctrine that allows the persons who actually control the corporation to disregard the corporate form."]; *Brooklyn Navy Yard, supra*, 60 Cal.App.4th 248, 258-259.)

Enciso was capable of contracting either on his own behalf or on behalf of Torrey Pines, and he chose to use Torrey Pines for tax purposes. When he sued Aardema on behalf of Torrey Pines, Torrey Pines became exposed to reciprocal liability for contractual attorney fees, and such an award was eventually made (although it is unknown to us whether it has been paid). (Civ. Code, § 1717, subd. (a).) Conversely, when Enciso sued Aardema, he could theoretically argue (if he lost) that there was no contractual attorney fees arrangement binding him individually. (Whether Torrey Pines has assets to pay such an award is unknown to us.) Under the above authorities, a business decision to operate in a corporate capacity has consequences. For purposes of further contract analysis, we next examine the special characteristics of a subchapter S corporation such as Torrey Pines.

19

B.  Identity of "S Corporations" and Their Shareholders

Revenue and Taxation Code section 23800 provides that the S corporation provisions found in the IRC shall apply in California, "except as otherwise provided." (See fn. 1, *ante*; no such statutory "exception" has been pointed out that would apply to this case.)  A "small business corporation" may make an election to become an S corporation that does not pay corporate income taxes, but instead, reports any corporate profits or losses through the shareholders in their individual returns.  (26 U.S.C. §§ 1361(a), 1362(a)(1).)  An S corporation thus obtains tax treatment that is different from the usual form of corporation taxation (in which the corporation is taxed as a separate legal entity).  (*Valentino v. Franchise Tax Bd.* (2001) 87 Cal.App.4th 1284, 1288-1290 (*Valentino*) [California source income of an S corporation, passed through to a nonresident, is subject to California tax].)

Admittedly, we are not concerned with Torrey Pines's tax treatment, or Enciso's, for that matter.  Nevertheless, for contract analysis, we are concerned with the degree of separate identity that Enciso and his small business corporation may have.  As this court explained in *Valentino,* " 'The S corporation is, in effect, a Code-created hybrid combining traits of both corporations and partnerships.' "  (*Valentino, supra,* 87 Cal.App.4th at pp. 1288-1289; *Heller v. Franchise Tax Bd.* (1994) 21 Cal.App.4th 1730, 1733.)  Federal tax law provides that "the character of a shareholder's pro rata share of S corporation income is determined as if the income were realized directly from the source from which realized by the corporation. [Citation.]  This principle is known as the 'conduit rule' and was intended by Congress to be the same as the partnership rule."

(*Valentino, supra,* at p. 1289; *Francis v. Equilon Enterprises, LLC* (9th Cir. 2002) 46 F.Appx. 562, 563-564.)

But for business purposes *other than tax*, Torrey Pines as an S corporation was not a mere "conduit" as to income or loss. (Cal. Practice Guide: Corporations (The Rutter Group 2014) ¶ 2:119, pp. 2-89 to 2-90.) Torrey Pines remained a separate corporate entity, for nontax purposes. (*Cooperman*, *supra*, 49 Cal.App.3d 1, 7-9.) The annotations to title 26 United States Code section 1361 include cases from other jurisdictions explaining that for nontax purposes, an S corporation retains a separate identity from its shareholders. In *United States v. Richardson* (10th Cir. 1972) 469 F.2d 349, 350-352, the court stated that Subchapter S, in authorizing small business corporations to elect not to pay corporate income taxes and to report corporate profits or losses through stockholders in their individual returns, does not prevent the corporations from retaining their corporate character, and they do not assume any of the characteristics of a partnership.

Likewise, *Labar v. Labar* (Pa. Super. Ct. 1994) 644 A.2d 777, 778, footnote 1, held that a subchapter S corporation is a designation for federal income tax purposes, which should have no effect for corporate law purposes. (Accord, *Johnson v. United States* (E.D.Ky.1974) 386 F.Supp. 374, 377, which stated that the "unique tax policy" of subchapter S, for an electing small business corporation, does not diminish or replace the character of the electing entity as a "corporation" for other federal income tax purposes.)

The subchapter S designation does not help Enciso show he is the same entity as Torrey Pines, for contracting purposes. We next evaluate this record in light of the statutory scheme that requires real estate licensing for brokerage activity.

21

III

*SUBSTANTIVE LAW:  BROKER'S LICENSING REQUIREMENTS*

A.  Statutory Purposes; Case Law

The burden was on Enciso to plead and prove that he met the statutory criteria for an award of broker's commissions, including his possession of a license.  (§ 10130 [unlawful "to engage in the business of, act in the capacity of, advertise as, or assume to act as" real estate broker/salesperson without a license], § 10136; 10A Cal.Jur.3d (2015) Brokers, § 141, p. 352.)  This is not a case of mere tardiness in obtaining or keeping up a license, such as could invoke substantial compliance considerations.  (See 2 Miller & Starr, *supra,* Cal. Real Estate, § 5:1, p. 5-9, fn. 32 [observing that in a construction licensing case, *MW Erectors, Inc. v. Niederhauser Ornamental and Metal Works Co., Inc.* (2005) 36 Cal.4th 412, 440-441, the Supreme Court relied on real estate broker decisions to explain why a construction contract entered into prior to licensure is not void].)

Rather, we should look to whether the listing agreements providing for commissions can be enforced by a nonparty to them.  To the extent that Enciso wants to show Torrey Pines was his own alter ego for brokerage purposes, "the courts will look to the substance rather than the form of the transactions."  (*Cooperman*, *supra*, 49 Cal.App.3d 1, 7.)  "A sufficient showing must be made that the corporation is but the instrumentality through which the individual transacts business."  (*Ibid*.)  The usual test is whether " '(1) there is such a unity of interest that the separate personalities of the

22

corporations no longer exist; and (2) inequitable results will follow if the corporate separateness is respected.' " (*Brooklyn Navy Yard, supra*, 60 Cal.App.4th 248, 257-258.)

A cause of action for a broker's recovery of a commission normally arises when the broker has satisfied the conditions of a conditional contract (here, there was no procuring cause condition). (See 2 Miller & Starr, *supra*, Cal. Real Estate, § 5:1, p. 5-9.) " 'The purpose of the licensing requirement is to protect the public from the perils incident to dealing with incompetent or untrustworthy real estate practitioners.' " (*GreenLake Capital, LLC v. Bingo Investments, LLC* (2010) 185 Cal.App.4th 731, 736.) " '[W]hen the evidence shows that the plaintiff in substance seeks to enforce an illegal contract or recover compensation for an illegal act, the court has both the power and duty to ascertain the true facts in order that it may not unwittingly lend its assistance to the consummation or encouragement of what public policy forbids.' " (*Estate of Prieto* (1966) 243 Cal.App.2d 79, 85-86 (*Estate of Prieto*); see *Consul, Ltd. v. Solide Enterprises, Inc.* (9th Cir. 1986) 802 F.2d 1143, 1151, fn. 8 [contract under which an unlicensed party performs brokerage services is unenforceable, even by a licensed broker who acted pursuant to the same contract]; § 10130 [licensing requirement for brokers].)

The trial court repeatedly relied on *Baldwin, supra*, 34 Cal.App.3d 596, in concluding that Enciso's performance of brokerage services on behalf of his unlicensed corporation was compensable. In *Baldwin*, the facts involved a probate sale of real property to a high bidder, in which the courts allowed Mr. Lembi, an individual unsuccessful bidder and real estate broker, to recover a commission for services in connection with the sale. Lembi was individually licensed as a broker under his own

23

name, and he conducted business under the fictitious name of an unlicensed corporate dba, Skyline Realty (Skyline). Originally, the probate sellers had agreed to accept his personal buyer's bid, and he attached documents to the bid representing that Skyline would be the broker, and he or someone else wrote in his license number on the documents. (*Id*. at pp. 600-601.) However, at the probate hearing to confirm the sale, the higher bidder won the right to make the purchase. The probate court then awarded Lembi, as the originating broker, a portion of the commission on the sale. The probate principals (the sellers) appealed, as did the ultimate purchaser's broker, both objecting that Lembi should not get any commission.

In *Baldwin*, the appellate court gave several reasons for allowing Lembi to receive a partial commission as the originating broker, even though Skyline or Skyline, Inc., his "fictitious" business names (*Baldwin, supra,* 34 Cal.App.3d at p. 599), did not have licenses and Lembi did not get the property. Most important here is the court's rejection of the argument by the other broker (Seeley-McGonagle) that the written contract employing Skyline as a broker was illegal, void and unenforceable under section 10136, because Skyline was unlicensed. The court explained that while Skyline itself could not recover a commission (unlicensed), Lembi was able to do so because he individually performed valuable professional services while doing business under the fictitious name, and his personal license number appeared in the bid documents (the bid, sellers' acceptance, and "Broker's Acceptance" of commission, as well as probate pleadings). (*Baldwin, supra,* at pp. 604-605.) Under probate law, his cause of action for the recovery of a commission arose when the real property sale was made, confirmed or approved by

24

the court, and consummated. (2 Miller & Starr, Cal. Real Estate, *supra*, § 5:1, p. 5-12.)

That was a different accrual rule from the non-probate context, as here. (*Id.* at p. 5-9

[right to commission arises when broker satisfies the conditions of a conditional

contract].)

In *Baldwin*, the court declined to apply the contractor's licensing law, section

7031, to bar the unlicensed corporation from recovering on a contract. (*Baldwin, supra,*

34 Cal.App.3d at pp. 604-605.) Instead, the court appeared to believe that it was not

significant that the license was in a different name from the contract, because the broker's

services were rendered in a professional capacity, and Lembi (the sole owner and

managing officer) held a valid contractor's license. Apparently, Lembi was deemed to be

equivalent to an alter ego or agent of the named corporate broker. (*Id.* at p. 605; see 2

Miller & Starr, Cal. Real Estate, *supra*, § 5:1, p. 5-13, fn. 50, citing *Baldwin* for the point

that services performed by a licensed broker can be compensated even if the contract

provides for payment to an unlicensed corporation the broker owns.)

In *Baldwin*, the court also relied on *Schantz, supra*, 19 Cal.App.3d 289, in which a

licensed broker (whose office was located at one address) performed services while

operating out of another branch office (which did not have a branch office license or

fictitious business name license). The licensed broker in *Schantz* was entitled to recover

commissions, even though his branch office lacked a license, because he was able to

prove that he was "a duly licensed real estate broker" as required by section 10136, at his

main office. The court noted that section 10136 does not expressly deal with additional

requirements for a branch office license or fictitious business name license, as well as a

25

broker's license.  The court ruled:  "(1) the purpose of the licensing law is to protect the public from the perils incident to dealing with incompetent or untrustworthy real estate brokers and such purpose is satisfied by proof of a valid real estate broker's license; and (2) the licensing law should not be so literally construed as to require exact compliance 'if it would transform the statute into an "unwarranted shield for the avoidance of a just obligation." ' "  (*Baldwin, supra,* 34 Cal.App.3d at p. 605; *Schantz*, *supra*, at pp. 291-293.)  Even though the statute provided that a failure to obtain the additional licenses could have been grounds for professional discipline, it did not expressly supply grounds to set aside the underlying transaction.  (*Ibid*.)

In a separate holding in *Baldwin*, the court concluded that the deal documents taken together (bid, acceptances by sellers and the broker, as well as a probate return and petition), satisfied the statute of frauds.  (Civ. Code, § 1624; *Baldwin, supra,* 34 Cal.App.3d at pp. 603-604.)  In other findings, the appellate court stated due process concerns were satisfied in the context of a probate confirmation of the sale.  (*Id.* at pp. 606-609.)  The court also seemed to find it significant that two of the principal residuary beneficiaries of the estate did not object to the payment of the commission to Lembi.  (*Id.* at p. 603.)

The court in *Baldwin, supra,* 34 Cal.App.3d 596, based its decision on still another factor, full disclosure of Lembi's "dual capacity" as a bidder/broker in probate court.  Although that set of facts is not directly involved here, we take note that this separate holding in *Baldwin*, on dual capacity bids, was criticized in later case law and has been superseded by statute.  (*Estate of Toy* (1977) 72 Cal.App.3d 392, 395 [right to recover a

26

commission on a probate sale is to be determined separately from the question whether a person who has been retained to act as a broker may purchase the subject property on his own account].) Therefore, *Baldwin* is no longer good authority to allow a broker to obtain a commission when taking a dual position in a probate sale, because Probate Code section 10160.5 (enacted 1990) now controls the issue and has adopted the position in *Toy* (rejecting the *Baldwin* approach). (2 Miller & Starr, Cal. Real Estate, *supra*, § 5:76, pp. 5-322 to 5-324.)

To a great extent, it appears that the appellate court reached the result it did in *Baldwin*, *supra*, 34 Cal.App.3d 596 because the issue arose in the context of a probate sale which was judicially supervised, and there was extensive participation of the estate's counsel throughout the proceedings, taking positions on the broker's behalf, both when the original bid was presented and at the commission stage. (*Id.* at pp. 600-602.) We are concerned that the reasoning in *Baldwin* was not well grounded insofar as it gave a commission to an individual who was named as a broker in the contract through his dba, which was unlicensed. It should not have been deemed adequate that someone put Lembi's individual license number on the documents, when the broker was a separate legal entity and the individual was acting as the proposed buyer under those circumstances. (The Torrey Pines listing agreements do not show any license number at all.) Under section 10157, a broker's authority is personal to the licensee.

Although the court in *Baldwin, supra,* 34 Cal.App.3d 596 appeared to characterize Lembi as an alter ego or agent of the named broker, the basis for that conclusion (e.g., avoiding injustice) is unclear. Since Lembi's bidding documents named his own

27

unlicensed dba as a broker, its participation should have invalidated his personal commission request. (*Estate of Prieto*, *supra*, 243 Cal.App.2d 79, 85-86.) Also, Lembi's cause of action for the recovery of a commission arose later than the contract formation and performance. (2 Miller & Starr, Cal. Real Estate, *supra*, § 5:1, p. 5-12 [in probate, the commission rights arose upon confirmation of the real property sale].) Possibly, the appellate court assumed that the probate court had flexibility in equity in allowing a commission to the individual, on an alter ego or agency basis. Although the court in Baldwin relied on the policies expressed in *Schantz, supra,* 19 Cal.App.3d 289, that was a case involving separate franchise or fictitious business licenses, and there are no issues in our case in that area.

We do not address any statute of limitations arguments as raised in Aardema's affirmative defenses. However, assuming that normal accrual rules in the nonprobate context should apply here, a right to a contractual commission arises when a broker satisfies the conditions of a conditional contract. (2 Miller & Starr, Cal. Real Estate, *supra*, § 5:1, p. 5-9.) In the licensing context, section 10136 controls which brokers may seek awards of commissions, and alter ego rules are applied more strictly. The authority of *Baldwin, supra*, 34 Cal.App.3d 596 is tenuous on the statutory requirements and it does not support Enciso's efforts to enforce Torrey Pines's contracts.

## B.  Application of Principles

We next turn to the specifics of Enciso's situation to analyze whether the licensing requirement was satisfied. Enciso's respondent's brief takes the position that Aardema was not misled by Enciso's use of his corporation, and therefore the listing agreement was

28

enforceable due to fair notice given to Aardema, through their longstanding professional relationship of at least 30 transactions, both before and after Enciso formed his corporation. Aardema knew that Torrey Pines's brokerage services would be performed exclusively by Enciso. Aardema "used [Enciso] almost exclusively" as his broker for leases and "would bring [Enciso] into the transaction" if another listing broker was involved. This allowed Aardema to get a better price.

Any actual knowledge that Aardema had about Enciso's business practices is not dispositive, because the licensing law imposes additional restrictions on brokerage contracts, and the burden is on the broker to plead and prove compliance with licensing requirements. (§ 10136.) In any event, contract enforcement does not depend on the subjective beliefs of the parties during the negotiations. "California recognizes the objective theory of contracts [citation], under which '[i]t is the objective intent, as evidenced by the words of the contract, rather than the subjective intent of one of the parties, that controls interpretation' [citation]. The parties' undisclosed intent or understanding is irrelevant to contract interpretation." (*Founding Members, supra*, 109 Cal.App.4th 944, 956; *Winet v. Price* (1992) 4 Cal.App.4th 1159, 1166, fn. 3 (*Winet*).)

Although the trial court attempted to resolve the matter on the face of the documents, it ignored the essential criterion of who the parties to the contract were, for purposes of standing to enforce it. The rights of the parties to a brokerage contract are determined from the four corners of the document. (*Blank, supra,* 11 Cal.3d at p. 969.) To the extent that the court was using strict construction rules, without any parol evidence rulings, its factual findings and legal conclusions failed to adequately account

29

for the discrepancy between the name of the individual plaintiff and the corporate name on the contracts. The previous ruling granting judgment on the pleadings on Torrey Pines's version of the complaint was not challenged. It was inconsistent for the court to enforce the license requirement there but ignore it here.

In his closing argument, Aardema continued to oppose contract recovery for the corporation's work, pointing out that it was Torrey Pines that originally filed the case and participated in discovery, not Enciso personally. The key issue was not who " 'did the work,' " but who was " 'engaged in the business or acting in the capacity of a contractor.' " (*Opp, supra*, 154 Cal.App.4th 71, 75.) In that case, the party to the contract was an unlicensed corporation, and the licensed individual who alleged the corporation was merely his fictitious business name, under which he did business as a licensed contractor/sole proprietor, was not allowed under section 7031 to recover on the corporation's contract. The nature of the work required a license for the contractor. (*Opp, supra,* at p. 74.)

Here too, Enciso utilized his corporate entity to enter into the listing agreements. Torrey Pines was not merely his sole proprietorship or dba, as he claimed, because Enciso as an individual could not adopt a fictitious name that included corporate status. (§ 17910.5; *Opp, supra,* 154 Cal.App.4th at pp. 74-75.) Torrey Pines was a separate legal entity which potentially gave him some protections against personal liability, as well as tax protections. Enciso cannot now repudiate the corporate existence "just because the corporation has become an inconvenience." (*Id.* at p. 76.) It is clear that Enciso "in substance" seeks to recover compensation for real estate brokerage services, and the trial

30

court erred in concluding he is a proper plaintiff. (*Estate of Prieto*, *supra*, 243 Cal.App.2d at pp. 85-86.)

Further, the alter ego doctrine does not support the judgment. "Because it is founded on equitable principles, application of the alter ego 'is not made to depend upon prior decisions involving factual situations which appear to be similar . . . . "It is the general rule that the conditions under which a corporate entity may be disregarded vary according to the circumstances of each case." ' " (*Las Palmas Associates v. Las Palmas Center Associates* (1991) 235 Cal.App.3d 1220, 1248.) The alter ego doctrine applies equitable principles to prevent injustices. (*Twenty-Nine Palms Enterprises, supra*, 210 Cal.App.4th 1435, 1451.) Enciso's self-created problematic situation does not justify strict enforcement of his unlicensed corporation's listing agreements for brokerage work, even though he as owner/shareholder held a license, because he did not comply with sections 10130 and 10136.

Even accepting the views in *Baldwin, supra,* 34 Cal.App.3d 596 that the licensing law should not be so literally construed as to require exact compliance " 'if it would transform the statute into an "unwarranted shield for the avoidance of a just obligation," ' " this record does not support a conclusion that Enciso has pleaded only his own "just obligations" on the face of the listing agreements. (*Id.* at p. 605; *Schantz, supra*, 19 Cal.App.3d at pp. 292-293.) Instead, "[t]he evidence allowed only one conclusion, as a matter of law," that the contracting entity was Torrey Pines, a separate entity which was unlicensed as a broker, and the work performed was brokerage work requiring a license. (*Opp, supra*, 154 Cal.App.4th 71, 76.) As the individual shareholder

31

and owner of the unlicensed corporation, Enciso was statutorily ineligible to enforce the corporation's contracts for commissions.

### C. Alternate Theory of Promissory Estoppel; Open Reversal

Enciso next argues that in this appeal, Aardema failed to brief the defects, if any, in the alternative promissory estoppel recovery allowed by the trial court, and he has thus waived such appellate claims. (*Drennan v. Star Paving Co.* (1958) 51 Ca1.2d 409, 413-414 [claim of promissory estoppel does not require the existence of a contract between the parties]; *Christoff v. Union Pacific Railroad Co.* (2005) 134 Cal.App.4th 118, 125-126 [judgment affirmed where alternative ground for judgment not challenged on appeal].) Aardema contends in his reply brief that each of his arguments was directed toward all causes of action. We conclude he has adequately pointed out that there is a serious defect in the identity of the party plaintiff here, on each of the theories of recovery. No consideration of any new factual matters is required to determine that the judgment is inadequately supported on promissory estoppel grounds as well.

Finally, we are aware that Aardema raised an affirmative defense that the course of conduct between the parties was contrary to that described in the complaint, and he argued Enciso should not be able to pick and choose when he will attempt to enforce a listing agreement, when only two of them were pursued here, out of seven or eight that were created, out of 30-some transactions. On a related point, the trial court declined to resolve Enciso's motion in limine that raised parol evidence objections to any evidence about potential offsets to the commissions for amounts due to the cooperating brokers, if any. (See *Winet, supra,* 4 Cal.App.4th 1159, 1165-1166; Code Civ. Proc., § 1856,

32

subd. (c) [apparently finalized contract terms "may be explained or supplemented by course of dealing or usage of trade or by course of performance"].)  We need not resolve those points, nor reach the arguments on appeal about any preclusive effect of the statutes of frauds or limitations or judicial estoppel.  We determine only that on the present record, the contract-based judgment in favor of Enciso cannot stand.

An open reversal of a judgment places the parties in the same positions as they were before the rendition of the reversed judgment or order.  (*Weisenberg v. Cragholm* (1971) 5 Cal.3d 892, 896.)  After an open reversal, the trial court has the discretion to hear and determine motions to amend the pleadings.  (*Clark v. Baxter Healthcare Corp* (2000) 83 Cal.App.4th 1048, 1055-1056.)  We decline to express any opinion on evidentiary or legal matters that may arise on remand.

## DISPOSITION

The judgment is reversed and the trial court is directed to allow appropriate further proceedings in light of the views set forth in this opinion.  Costs are awarded to appellant.

HUFFMAN, J.

WE CONCUR:

McCONNELL, P. J.

McINTYRE, J.

33